130 S.E.2d 625 (1963)
259 N.C. 294
The DUNES CLUB, INC.
v.
CHEROKEE INSURANCE COMPANY.
The DUNES CLUB, INC.
v.
STATE CAPITAL INSURANCE COMPANY.
The DUNES CLUB, INC.
v.
AMERICAN NATIONAL FIRE INSURANCE COMPANY.
The DUNES CLUB, INC
v.
MERCHANTS & MANUFACTURERS INSURANCE COMPANY.
The DUNES CLUB, INC.
v.
NATIONAL FIRE INSURANCE COMPANY OF HARTFORD (two cases).
The DUNES CLUB, INC.
v.
NORTH RIVER INSURANCE COMPANY.
The DUNES CLUB, INC.
v.
STANDARD FIRE INSURANCE COMPANY.
The DUNES CLUB, INC.
v.
UNITED STATES FIDELITY & GUARANTY COMPANY.
The DUNES CLUB, INC.
v.
The AMERICAN INSURANCE COMPANY.
No. 94.
Supreme Court of North Carolina.
May 1, 1963.
*628 Smith, Leach, Anderson & Dorsett, Raleigh, and Harvey Hamilton, Jr., Morehead City, for defendants-appellants.
Wallace & Wallace, Kinston, and C. R. Wheatly, Jr., Beaufort, for plaintiff-appellee.
PARKER, Justice.
The ten defendants have filed a joint brief. They assign as error the denial of their motion for a judgment of nonsuit in each case, made at the close of all the evidence.
Plaintiff offered evidence which, considered in the light most favorable to it, Smith v. Rawlins, 253 N.C. 67, 116 S.E.2d 184, 85 A.L.R.2d 609, tends to show the following:
Its building, located on Atlantic Beach, was a one-story frame building, constructed on cypress piling. The piling was buried in sand five feet. The first main floor elevation was five feet above the elevation of the beach. The walls were of 2×4 studs covered with cypress shingles. The roof framing was of 2×8, 2×10, 2×6, which was good heavy construction. The roof was originally covered with cypress shingles, later covered with asphalt shingles. The building contained a ballroom 50×30 feet, over which was a high-pitched roof with a cupola in the center. At each of the four corners of the main section was attached a wing, over each of which was a lowpitched roof. This building on 11 September 1960 before Hurricane Donna came was in good condition, and had in it furnishings and equipment of the actual cash value of $11,500.00.
The building was located on the beach about 140 to 150 feet from the average high water mark of the Atlantic Ocean and on land about a foot above sea level. The Oceana Motel constructed of masonry was 260 feet to the northwest of plaintiff's building. The Oceana property is 134 feet to the west on a line parallel with the ocean front, at which point the Oceana Beach House is located. The relative elevation of the land between these buildings was practically the same. Plaintiff's building was about 700 to 800 feet south of the Fort Macon-Atlantic Beach Road. From its building to this road was an asphalt driveway through a gap in sand dunes and across land about level.
About 9:00 p. m., or earlier, on 11 September 1960 a hurricane known as Hurricane Donna struck the Atlantic Beach area from a direction approximately southeast. After 8:30 p. m. on this date, H. G. Ball, manager of the Oceana Motel, tried to go around the east side of the motel, and could not; the wind was too strong, it blew him back just like he "was on roller skates." He took hold of the handrailing and tried to pull himself around, and could not do so. He had a spotlight with a battery that would throw a beam 1000 feet. He testified: "I did shine my light over towards The Dunes Club area to see if there was any water. I observed on the ground that night a lot of debris; I didn't observe any water. By debris, I meant building materials, shingles, and such as that. I *629 could identify the debris as to where they came from." He was then permitted to testify, over defendants' objection, that the debris and building material came from The Dunes Club.
About five o'clock next morning H. G. Ball examined the Oceana Motel. On the east side he saw cypress shingles and debris everywhere that he could identify. The windows on the east side had plate glass windows about half an inch thick. These were broken out. On the east side of the motel was an upper deck 8 or 9 feet above the ground. He testified: "No water during the night of September 11, 1960 got on the yard area or any portion of the area of the Oceana Motel." The closest building east of The Dunes Club was about 1000 to 1500 feet distant.
He was permitted to testify, over the objection of the defendants, in substance as follows: On the upper deck of the motel he saw a door and a lot of shingles and building material. The door was the inside door from The Dunes Club; the shingles and building material came from The Dunes Club. He had seen the door before; it was painted green on one side, and the other side was stained; it was the same kind of door which was inside The Dunes Club. Inside the rooms on the east side, where the windows were broken out, he found shingles and pieces of lumber next morning.
He testified further, without objection, in substance as follows: He was at sea for eight years in the Merchant Marines, and he has lived in Carteret County twenty years. He has been in hurricanes when at sea on shipboard, and he has been in Hurricanes Hazel, Ione, Connie, and Donna in Carteret County. He was then permitted to testify, over defendants' objection, in substance as follows: He has a wind gauge, which has a glass tube with a special fluid in it. The gauge is fastened "to a thing up on the roof, the tube running down in the office." The wind pushes the fluid up, and it is graduated in miles per hour. He has had this wind gauge a couple of years, and he has watched it to see how hard the wind blows. The wind of Hurricane Donna on 11 September 1960 was very much stronger than the highest winds he experienced in Hurricane Hazel.
David Hart Mansfield on 11 September 1960 was manager of the Oceana Beach House and fishing pier. Before then he had worked for 27 years on a dredge boat about ten years as captainbetween Wilmington, Delaware, and the Canal Zone. "It operated a 27" pipeline." During that time he was particularly concerned with winds and hurricanes. He had a ship-to-shore radio in order to get radio reports every hour, and "when the wind got to a certain velocity, I had to take it in." He had a wind gauge aboard the dredge and read the gauge. He had a whether map under a glass on his desk, and he would sit there and plot the wind on the map as he received the radio reports of the velocity of the wind. He had a wind gauge on the wall of the beach house, which he had installed in the spring of 1959. He described the gauge in detail. It has a red fluid, which the wind pulls up and down. He knows how to calibrate it, and from time to time has attempted to calibrate it for accuracy.
Mansfield was permitted to testify, over the objection of the defendants, in substance as follows: He had compared the readings on his gauge with official weather reports and with the readings of other wind-measuring devices, and the readings on his gauge would be the same as others, maybe a point off one way or the other. By official weather reports he meant radio reports. He has been in 15 or 20 hurricanes and cyclones, and has measured them with wind gauges. At 9:15 p. m. on 11 September 1960 he could not tell what his wind gauge read because "it went out of sight up into the fluid here." The last number he read was 80 miles per hour. He stood on the north side of the beach house. He saw debris blowing over the parking lot: it was in a whirl, going *630 round and round. He had been in cyclones that acted like that. The next morning he saw debris on the ground. It was shingles and lumber from The Dunes Club, and an inside wall of The Dunes Club lying across the motel sidewalk. There was so much of this debris that he could not get his car to the beach house. Some of the boards were from 3 to 16 feet long, and there were some 2x4s and 3x6s.
Mansfield further testified, without objection, to this effect: About 9:15 p. m. on 11 September 1960 you could not keep your eyes open on the north side of the beach house for sand and wind. Visibility was bad. At the intersection of the Fort Macon Highway and The Dunes Club Road, the road was all gone, and a big hole was there, 5 or 6 feet deep. About 100 feet of The Dunes Club Road leading from the Fort Macon Road was gone.
About 8:17 a. m. the next day Edward Dixon, president of plaintiff, went to its property. At that time the only part of The Dunes Club's building standing was the men's locker room; all the rest of it was scattered here and there down to the Fort Macon Road. The roof part of the building was banked against a dune 50 to 75 feet from the Fort Macon Road. The dune was about 15 feet high. A part of the roof was within two or three feet of the top of the dune. The windows in the cupola on the roof were not broken. The ballroom floor of The Dunes Club was across the Fort Macon Road turned upside down. In The Dunes Club's building there had been an iron safe weighing 1000 to 1200 pounds in a little office adjoining the men's locker room. He saw this safe 100 feet from where the building stood, buried halfway in sand. He testified: "I observed debris in the vicinity of the Oceana Motel that morning; I saw shingles and quite a few shingles from the club that I could identify on the porch and in the rooms of the Oceana Motel. I went into the bedroom because the windows on the east and west side of the motel were blown out. I saw debris in the bedrooms and on the porch of the Oceana Motel that had come up from The Dunes Club. I found debris on the outside of the motel on the porch and in some of the bedrooms upstairs and down." Where The Dunes Club Road intersected the Fort Macon Road, both roads were washed out.
The evidence tended to show the Oceana Motel Beach House, which had a sea wall, sustained no damage except the loss of a few shingles, and that the Oceana Motel's damage consisted of the broken windows on the east side and the removal of the covering of the roof.
Defendants' evidence tended to show that plaintiff's loss was caused by or resulted from or was contributed to or aggravated by water and was not a direct loss by windstorm. They offered as witnesses a highway patrolman and a free-lance photographer, who visited the scene the following morning and illustrated their testimony as to what they saw by over 50 photographs. They also offered as a witness David M. Mackintosh, Jr., who was held by the court to be an expert witness in the field of engineering and architecture, and who testified in substance as follows, illustrating his testimony by many photographs: A few days after 11 September 1960 he came to Atlantic Beach in a professional capacity to make an investigation in respect to The Dunes Club's building, and generally along the beach. He found the roof section of The Dunes Club's building with the cupola near the Fort Macon Road in very good structural shape. It was not distorted or cracked. On this roof he saw a line caused by dirt, salt in the water, and grass. When water goes down it leaves such a line. In his opinion, the roof with the cupola was not blown off, but floated to where it came to rest, and this is shown, among other things, by this line. That the static highwater line on The Dunes Club's property was 5½ feet above the level of the club's driveway, as determined by the water lines inside the club's property and checked with static high-water line indications in adjoining and nearby properties, showing that *631 the water was 5½ feet deep inside the club's property when the water became still and began receding. That the club's driveway and Fort Macon Road were washed out by water moving from south to north through the gap in the dunes. In his opinion, plaintiff's building could not have been moved off its foundation supports by the action of the wind. In his opinion, the ballroom floor of The Dunes Club floated to where it came to rest. In his opinion, the iron safe of plaintiff was too heavy to be blown where it was found or to float there; that it floated away on a floor from where it was in the building and slid off where it was found, and the floor floated on.
Mackintosh testified, without objection, on cross-examination: "Anything above 75 miles per hour is classified as a hurricane. * * * On September 11th there was a hurricane tide coming; it was not a normal tide; it was a hurricane that night."
Defendants assign as error that the witness Ball was permitted over their objections to testify in substance that on the morning of 12 September 1960 he saw on the upper deck of the Oceana Motel a door and a lot of shingles and building material, and that they came from The Dunes Club; that the door was an inside door of The Dunes Club; and that some of the shingles and pieces of lumber were inside the rooms on the east side of the motel. Defendants also assign as error that the witness Mansfield was permitted to testify over their objections that the next morning he saw shingles, lumber and an inside wall from The Dunes Club on the ground about the Oceana Beach House and the Oceana Motel. Edward Dixon was a witness before Ball and Mansfield were called as witnesses, and testified without objection to the same or similar effect as did Ball and Mansfield later in the part of their testimony challenged as set forth above in this paragraph. This Court said in Shelton v. R. R. Co., 193 N.C. 670, 139 S.E. 232: "It is thoroughly established in this state that, if incompetent evidence is admitted over objection, but the same evidence has theretofore or thereafter been given in other parts of the examination without objection, the benefit of the exception is ordinarily lost." The Court in the Shelton case, as shown by the record and the cases cited in support of the statement, is referring to the examination of the same witness. It seems that the rationale of the rule brings within its scope that if incompetent evidence is admitted over objection, but the same or similar evidence has theretofore or thereafter been given by a witness or other witnesses in the trial without objection, the benefit of the exception is ordinarily lost. In 5A C.J.S. Appeal and Error § 1735, p. 1030, it is said: "Error, if any, in permitting a witness to testify as to his opinion or conclusion is cured * * * by the witness' testimony as to the same fact being admitted at another point without objection." The objections to the testimony of Ball and Mansfield set forth above in this paragraph are overruled.
Defendants assign as error that Ball was permitted over their objections to testify that the wind of Hurricane Donna on 11 September 1960 was very much stronger than the highest winds he experienced in Hurricane Hazel. These assignments of error are overruled. 32 C. J. S. Evidence § 499. It would seem from reading his testimony in context that his comparison of the velocity of the wind in Hurricane Donna with the wind in Hurricane Hazel was based not upon any records or reports or reading of his wind gauge, but was based upon his experiences in having been in many hurricanes on land and on sea and upon his experiences in those two named hurricanes, and that the facts as to the velocity of the winds in the two named hurricanes as they appeared to him and were experienced by him cannot adequately and clearly be reproduced, described and detailed to the jury. The courts for that reason have found it necessary to admit this class of evidence, even from non-expert witnesses, which is usually called "opinion evidence." Steele *632 v. Coxe, 225 N.C. 726, 36 S.E.2d 288; 20 Am.Jur., Evidence, sec. 769; Stansbury, N. C. Evidence, sec. 125. In Wood v. Michigan Millers Mutual Fire Insurance Company, 245 N.C. 383, 96 S.E.2d 28, this is said: "The exception and assignment of error to the question and answer: `Q. And to what extent was the wind blowing, if you have a way of describing it? A. Well, it was just blowing too hard for me to get outdoors and face it * * *' is without merit. The witness had previously testified: `The wind sure was blowing that day.' There was other testimony: `The wind was blowing so terrific that it was almost impossible to stand up on the outside * * *'"
Defendants assign as error that Ball was permitted over their objections to testify in respect to his wind gauge and his watching it to see how hard the wind blows. These assignments of error are overruled for the reason that a close reading of his testimony in the record discloses that it was of no benefit to plaintiff and of no prejudice to the defendants because, inter alia, he did not testify as to what his readings were.
Defendants assign as error that Mansfield was permitted over their objections to testify about his wind gauge, his operation of it, and a comparison of his readings on it with radio reports; that on 11 September 1960 he could not tell what his wind gauge read, "because it went out of sight up into the fluid here"; and the last number he read was 80 miles per hour. The manifest purpose of this evidence is to show there was a hurricane that night, and the velocity of the wind. Defendants' witness Mackintosh testified, without objection, on cross-examination: "Anything above 75 miles per hour is classified as a hurricane. * * * On September 11th there was a hurricane tide coming; it was not a normal tide; it was a hurricane that night." Even if we concede that the proper foundation had not been laid for Mansfield to testify that the last number he read on his wind gauge was 80 miles per hour, it would seem to be harmless because of Mackintosh's testimony there was a hurricane that night, and anything above 75 miles per hour is classified as a hurricane. However, we think that his testimony that he could not tell what his wind gauge read "because it went out of sight up into the fluid here," should have been excluded because of insufficient evidence to show that his wind gauge was properly made and operated to follow and accurately measure the velocity of wind according to sound scientific principles approved and generally accepted, and that it was in proper working condition at the particular time under consideration, and for the further reason that the radio reports and other wind-measuring devices with which he compared its measurements were not properly shown to be accurate. Wigmore, The Science of Judicial Proof, 3rd Ed., ch. XXI, sec. 220, p. 450.
Defendants assign as error that Mansfield was permitted over their objections to testify to the effect that at 9:15 p. m. on 11 September 1960 he saw debris blowing over the parking lot: it was in a whirl, going round and round. He had been in cyclones that acted like that. We think this evidence of what he saw then and had seen in previous cyclones was competent.
The evidence in this case is in sharp conflict. Accepting plaintiff's evidence as true and considering it in the light most favorable to it, and giving it the benefit of every reasonable inference to be drawn therefrom, Smith v. Rawlins, supra, and considering so much of defendants' evidence as is favorable to plaintiff, Bundy v. Powell, 229 N.C. 707, 51 S.E.2d 307, as we must do in ruling upon a motion for an involuntary judgment of nonsuit, we cannot say that plaintiff's evidence which was competent, and defendants' evidence favorable to it, if accepted by the jury, is insufficient to support a verdict for plaintiff that it sustained a direct loss by windstorm of its building and its contents therein under *633 the provisions of the policies of insurance here, and that the building and its contents were destroyed by winds of hurricane velocity before the water from the ocean came rushing upon its property. Hence, there was no error in the denial by the court of defendants' motion for a judgment of nonsuit in each case made at the close of all the evidence. Wood v. Michigan Millers Mutual Fire Insurance Company, 243 N.C. 158, 90 S.E.2d 310; same case, 245 N.C. 383, 96 S.E.2d 28; Sun Underwriters Ins. Co. of N. Y. v. Loyola University, 5 Cir., 196 F.2d 169.
On cross-examination by plaintiff of defendants' witness Mackintosh, one of plaintiff's counsel stated: "I am handing you the tide tables put out by the U. S. Department of Commerce, Coast and Geodetic Survey, High and Low Water, 1960, the East Coast for North and South America, including Greenland, and I ask you to examine this book * * *." He then asked him a number of questions as to what this book showed as to the tide at various times at Atlantic Beach on 11 September 1960, and over the objections of defendants the witness was permitted to answer a number of such questions as to what this book showed and to read from it. Defendants assign this as error, as set forth in exceptions 91-116. Defendants in their brief particularly complain of Mackintosh's answer to the effect that high tide on the night in question was around midnight.
There is nothing in the record to show that this book handed to Mackintosh by plaintiff's counsel was an official publication of the U. S. Department of Commerce, Coast and Geodetic Survey, except the statement of counsel, or that it was properly authenticated as required by G.S. § 8-35, or where it came from. It was not introduced in evidence, and we do not have it before us. Therefore, for the court under these circumstances to permit Mackintosh, over defendants' objections, on crossexamination, to state what this book showed and read from it was error. Wood v. Michigan Millers Mutual Fire Insurance Company, 245 N.C. 383, 96 S.E.2d 28; State v. Bovender, 233 N.C. 683, 65 S.E.2d 323; Knott v. Raleigh & G. R. Co., 98 N.C. 73, 3 S.E. 735, 2 Am.St.Rep. 321; Stansbury, N. C. Evidence, sec. 153; 20 Am.Jur., Evidence, secs. 1023-1026; Annotations 50 A.L.R.2d 1197 and 34 A.L.R.2d 1249. 33 U.S.C.A. § 883a, as amended 5 April 1960, 74 Stat. 16, provides that "the Director of the Coast and Geodetic Survey * * *, under direction of the Secretary of Commerce, is authorized to conduct the following activities: * * * (2) Tide and current observations * * *." See City of Oakland v. Wheeler, 34 Cal.App. 442, 168 P. 23; Taylor v. State, Tex.Civ.App., 158 S.W.2d 881. In the Wood case the Court held that testimony as to the contents of weather bureau records is properly excluded, since the records themselves should have been put in evidence. We think the admission of this evidence was highly prejudicial to defendants, because plaintiff had offered evidence tending to show that around 9:00 p. m. shingles and pieces of lumber from its building were being blown through the air, and this evidence tended to show that the high tide on that night was around midnight, and that this evidence would permit a reasonable inference that their building and its contents had about three hours to be destroyed by hurricane wind, and were in fact so destroyed, prior to the time the water reached its highest level and came on its property during the high tide about midnight. Sun Underwriters Ins. Co. of N. Y. v. Loyola University, supra. It would seem that the harmful effect to defendants of this testimony was emphasized by the court in its charge, when in stating the contentions of plaintiff it stated: "The plaintiff also says and contends that the computations made by the defendant and the conclusions made by him did not take into account the tides, that is the high and low tides on the day in question; (that the high tide on the night in question was around midnight; the low tide being at 5:35 in the afternoon) * *." *634 Defendants assign as error the part in parentheses.
For errors in the admission of evidence, as above pointed out, defendants are entitled to a
New trial.