## OLAN MILLS, INC., OF TENNESSEE v. CANNON AIRCRAFT EXECUTIVE TERMINAL, INC.

### (Filed 1 May 1968.)

**1. Bailment § 1—**

Evidence and allegation to the effect that plaintiff turned over possession of his airplane to defendant for repairs are sufficient to establish the relationship of bailor and bailee in regard to the airplane while in defendant's control or possession.

**2. Bailment § 3—**

Plaintiff's evidence to the effect that when he delivered his airplane to defendant for repairs of the radio the plane was in good condition and that while the plane was in defendant's possession and control it became damaged, makes out a *prima facie* case of actionable negligence against the defendant in the absence of some fatal admission or confession.

**3. Trial § 23—**

When the facts in evidence make out a *prima facie* case, it is properly submitted to the jury.

**4. Negligence § 1—**

The term "act of God" is used to designate the cause of an injury to person or property where such injury is due directly and exclusively to natural causes without human intervention and could not have been prevented by the exercise of reasonable care and foresight.

**5. Negligence § 20—**

An "act of God" must be specifically pleaded.

**6. Negligence § 1—**

The term "act of God" in its legal sense applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them.

**7. Negligence § 8—**

Legal responsibility for negligence joined with an act of God depends upon the fact that the negligence operated as an efficient and contributing cause of injury.

**8. Bailment § 3—**

Plaintiff's evidence was to the effect that he delivered his airplane in good condition to defendant for repair of the radio and that while in defendant's possession the plane was damaged. The evidence was sufficient to be submitted to the jury. *Held:* Defendant's evidence that a severe thunderstorm, accompanied by hail and by gusts of wind of a force up to 92 miles per hour, occurred while the plane was in its possession does not rebut the *prima facie* case on the ground that the plaintiff's damages resulted from an act of God.

**9. Negligence § 23—**

Proximate cause is ordinarily to be determined by the jury as a fact

from the attendant circumstances, and conflicting inferences of causation arising from the evidence carry the issue to the jury.

**10. Negligence § 28—**

An instruction that plaintiff could not recover if the sole proximate cause of its damage was an act of God but that if defendant were negligent and if such negligence joined with a storm as one of the proximate causes of plaintiff's damages, then defendant would be liable, *held* without error.

**11. Evidence § 48—**

Where there is sufficient evidence to support a finding that the witness in question was an expert in his field, it will be presumed that the court, before admitting his expert testimony, found that he was an expert, notwithstanding the absence of a specific finding to this effect, and a general objection to his testimony without specific objection to his qualifications will be considered only as to the competency of the particular question.

**12. Appeal and Error § 48—**

An objection is waived when evidence of the same import is thereafter admitted without objection.

HUSKINS, J., took no part in the consideration or decision of this case.

APPEAL by defendant from *Hasty, S.J.,* 2 January 1967 Schedule D Assigned Session of MECKLENBURG. Docketed and argued as Case No. 280, Fall Term 1967, and docketed as Case No. 279, Spring Term 1968.

Civil action for damages for destruction of an airplane while in defendant's possession for repairs to its radio.

From a verdict and judgment in favor of plaintiff, defendant appeals.

*Boyle, Alexander & Carmichael by R. C. Carmichael, Jr., for defendant appellant.*

*Hedrick, McKnight & Parham by Philip R. Hedrick for plaintiff appellee.*

PARKER, C.J. Defendant assigns as error the overruling of its motion for judgment of compulsory nonsuit made at the close of all the evidence, and certain alleged errors in the admission of evidence and in the court's charge to the jury.

Plaintiff's evidence tends to show: The plaintiff is a Tennessee Corporation engaged in the business of portrait photography with its principal place of business in Chattanooga, Tennessee. In July 1962 it operated two studios in Charlotte. Defendant is a North Carolina corporation with its principal place of business in Charlotte. It operates for profit a terminal and service facilities at Charlotte Municipal Airport, and in the course of its business maintains hang-

ers, service areas, and areas for parking and tying down aircraft.

On 23 July 1962 plaintiff's 1948 twin-engine Beechcraft airplane was piloted by its employee, Olan Mills, II, from Columbia, South Carolina, to Charlotte, arriving at Charlotte Municipal Airport about 12 noon. Mills wanted to have the plane's radio worked on, and had previously had radio work done by defendant. Mills was accompanied on his trip to Charlotte by Mr. and Mrs. J. M. McMillan and James E. Jolly, all employed by plaintiff corporation. Upon landing, Mills taxied the plane to the defendant's terminal and was directed to park in front of the terminal. He parked the plane, set the brake, locked the tail wheel to keep it from swiveling, and went into defendant's radio shop. He told the repairman that he had some radio work that needed to be done. Then Mills and the other three members of his party went to the terminal office and called someone on the telephone to pick them up and drive them into Charlotte. When the group left the terminal, the plane was still in the same place Mills had parked it. Mills was an experienced pilot, having been licensed in 1946; in 1952 he entered the Army, completed the Army aviation program, and flew while in the service.

Plaintiff alleges in its complaint that it delivered its airplane to defendant for repairs. Defendant admits in its answer that the plane was left with it. According to the plaintiff's evidence, and according to the allegation in its complaint and admissions in defendant's answer, the relationship of plaintiff and defendant was that of bailor and bailee; defendant in its brief admits this relationship. Under the circumstances defendant was under a legal duty to exercise ordinary care to protect plaintiff's airplane against loss, damage or destruction, and to return it in as good condition as when it received it. Liability for any damages to the airplane while in defendant's possession turns upon the question of the presence or absence of actionable or ordinary negligence on its part. *Electric Corp. v. Aero Corp.,* 263 N.C. 437, 139 S.E. 2d 682; *Dellinger v. Bridges,* 259 N.C. 90, 130 S.E. 2d 19; *Insurance Co. v. Motors, Inc.,* 240 N.C. 183, 81 S.E. 2d 416; *Vincent v. Woody,* 238 N.C. 118, 76 S.E. 2d 356; *Beck v. Wilkins,* 179 N.C. 231, 102 S.E. 313; *Hanes v. Shapiro,* 168 N.C. 24, 84 S.E. 33.

Plaintiff's evidence also tends to show the following: While Mills and his party were in Charlotte, a storm arose, with heavy rain and wind. When Mills returned to the airport about 5:30 p.m. and saw the Beechcraft it was about one hundred fifty feet south of where he had left it, wedged between a tree and a telephone pole. It was severely damaged. J. M. McMillan returned to the airport about 5:15 p.m. in an automobile with his wife and James E. Jolly. He drove up to the plane to see if Mr. Mills was there. He looked to

see if the plane had been secured and it had not. At that time the storm was increasing and McMillan drove back to the office area and sat in the car until the storm ended. McMillan had flown with Mills before and had served as a crew chief in charge of aircraft service and security in the Army Air Corps from 1942 to 1945.

Mrs. Willa McMillan testified that she "did not see any security ties of large chains or ropes or anything of that nature attached to the aircraft" when her husband drove up to it in the automobile. James E. Jolly also testified that he saw no lines or chains tying down the airplane. The McMillans and Jolly stated that they observed the plane again after the storm ended and that it was some distance from where they had last seen it and was severely damaged.

W. J. Connell, the operator of a repair and service shop for executive aircraft at Love Field in Dallas, Texas also testified for the plaintiff. In July 1962 he had been in the aviation business for 33 years; for 3½ years during World War II he was overseas as a technical adviser to the Air Corps with the duty of inspecting aircraft that had been damaged in battle or from other causes to determine if the planes were economically repairable; during this time he examined approximately 2000 aircraft, made detailed reports, and followed their repair and return to service. Connell testified that he had examined an average of approximately 100 aircraft per year in 43 states and several foreign countries since World War II, including many Beechcrafts similar to the one owned by the plaintiff. On the Saturday following the storm, Connell examined plaintiff's aircraft and determined that the repair cost would be approximately $46,000, and that it would not be economically feasible to repair the aircraft. He testified that the generally accepted practice for securing an aircraft when it was not stored in a hanger was to place chocks in front and rear of each main wheel, as well as tying the plane down with ropes, cables or chains; that the generally accepted practice for tying down an aircraft that is not equipped with tie-down loops on the wings was to tie it down by the landing gear.

Plaintiff's evidence tends to show that it delivered its airplane to defendant in good condition except for the trouble with the radio; that defendant accepted it for the purpose of checking and repairing the radio; that thereafter defendant had possession and control of it; that when plaintiff's employee returned to pick it up he found it in a badly damaged condition. This made out a *prima facie* case of actionable negligence against defendant, and, in the absence of some fatal admission or confession, was sufficient to take the case to the jury. *Electric Corp. v. Aero Co., supra; Dellinger v. Bridges,*

*supra; Insurance Co. v. Motors, Inc., supra; Vincent v. Woody, supra; Wellington-Sears Co. v. Finishing Works,* 231 N.C. 96, 56 S.E. 2d 24; *Oil Co. v. Iron Works,* 211 N.C. 668, 191 S.E. 508; *Hutchins v. Taylor-Buick Co.,* 198 N.C. 777, 153 S.E. 397; *Beck v. Wilkins, supra; Hanes v. Shapiro, supra.*

This Court said in *Insurance Co. v. Motors, Inc., supra,* at 187:

"When the facts in evidence make out a *prima facie* case, it is one for submission to the jury. As stated by Connor, J., in *Ross v. Cotton Mills, supra* [140 N.C. 115, 52 S.E. 121]: 'The defendant may, or may not, introduce evidence as it is advised. By failing to do so, it admits nothing, but simply takes the risk of *non persuasion.* This is what is meant by going forward with testimony. He, by this course, says that he is willing to go to the jury upon the plaintiff's evidence.' If the defendant elects to offer evidence tending to explain the cause of the fire, the reasonableness of the explanation is for the jury. *Springs v. Doll,* 197 N.C. 240, 148 S.E. 251. If the defendant offers evidence tending to show what happened with reference to the car while in its possession as bailee, the credibility of such evidence is for the jury. If the evidence offered by the defendant, assuming credibility, would exonerate the defendant, it would be entitled to a peremptory instruction thereon. *Travis v. Duckworth,* 237 N.C. 471, 75 S.E. 2d 309. The significance of '*prima facie* case' has been stated clearly and often. *Speas v. Bank,* 188 N.C. 524, 125 S.E. 398; *Hunt v. Eure,* 189 N.C. 482, 127 S.E. 593; *Vance v. Guy,* 224 N.C. 607, 31 S.E. 2d 766; N. C. Evidence, Stansbury, Section 203."

Defendant relies on *Morgan v. Bank,* 190 N.C. 209, 129 S.E. 585, and *Swain v. Motor Co.,* 207 N.C. 755, 178 S.E. 560, in which judgments of involuntary nonsuit were affirmed. However, those two cases are easily distinguishable from the one now before the Court. In *Morgan v. Bank, supra,* it appeared affirmatively from undisputed evidence that plaintiff's bonds had been stolen by burglars, who blew open the vault with high explosives and broke into the safety deposit boxes by use of a sledge hammer and cold chisel, there being no evidence of negligence on the part of the defendant. In *Swain v. Motor Co., supra,* it appeared affirmatively from undisputed evidence that a third party had stolen plaintiff's car under circumstances which negatived negligence on the part of defendant.

The defendant contends that a judgment of involuntary nonsuit should nevertheless have been entered, for the reason that its evi-

dence clearly rebuts plaintiff's *prima facie* case. With that contention we do not agree.

Defendant's evidence tends to show: That about 4 p.m. two of defendant's employees moved the plaintiff's plane from where it had been parked to the tie-down area of defendant's ramp; that the plane was tied down by chains on each main landing gear and on the tail wheel; that chocks were placed in front and behind the main wheels; that neither the controls nor the tail wheel were locked, and the brake was not set; that the chain around one of the main landing gear was placed around the polished metal shock absorber strut and that the chain could have dropped down on top of the painted surface of the strut and would have marked it if something pulled against it; that the chains were fastened with "S" hooks; that at the time the plane was moved it was not raining, but thunderheads were building up from the north; that defendant's employees moved several planes that afternoon and there were a total of about 16 or 17 planes on defendant's ramp; that only plaintiff's plane and another plane, designated an AT-6, came loose; that upon examination of the area where plaintiff's plane had been tied down it was discovered that the "S" hooks had been straightened out. Sergeant Robert L. McAnulty, a member of the North Carolina Air National Guard stationed at the airport, was also a witness for defendant. He testified that at his facility two aircraft which were tied down with ropes in the approved military manner had been damaged by the storm; that he did not receive any weather information from the terminal building that day; that he heard defendant's employees testify and demonstrate in court how they tied down plaintiff's plane, and that in his opinion an airplane mechanic would place a chain around the polished metal surface of the main strut only in "true desperation"; that he observed plaintiff's plane around 5 p.m. and *saw no evidence of its being tied down.*

A meteorologist from the U. S. Weather Bureau at the airport testified that a severe thunderstorm passed over the area that afternoon and that thunder was first heard at 5:07 p.m.; that at 5:22 it was raining heavily with small hail and the winds were blowing from the north at 30 knots, gusting to 50 to 55 knots, or 60-61 mph; that the highest velocity of the gusts was 80 knots or 92 mph at 5:20; that winds 75 mph are hurricane force, but gusts in this area do not classify a storm as a hurricane; that the first inkling he had of the approach of the storm was a large accumulation of thunderstorm type clouds from the north-northwest; that his office probably received a report from the Aviation Severe Weather Report Station at

Kansas City forecasting severe thunderstorms and gusts 60 mph developing in western North Carolina; that the facility of the Federal Aviation Authority at Hickory broadcast hourly weather observations to anyone having a receiver.

Other witnesses for the defendant testified as to the heavy rain and the storm damage to buildings and other aircraft. The president of defendant corporation testified that he observed an Air Commander aircraft blown around and damaged although one chain remained fastened; that he did not know who tied down the AT-6 on defendant's ramp or how it was tied down; that on another ramp two light aircraft came loose and intermingled. An employee of an aircraft sales and service company testified that two of his aircraft were blown around and that the "S" hooks had been straightened out. There was also evidence that two Eastern Airlines passenger aircraft were damaged by the wind, but there was no evidence that they had been tied down. Defendant's clerk-secretary testified that defendant had a weather teletype in its office and also a radio to monitor different frequencies.

From the above evidence the defendant contends that it had no advance warning of the approach of the storm and, therefore, it acted with ordinary care in protecting plaintiff's airplane; that the damage to the plaintiff's plane was proximately caused by an "act of God" and was not due to any negligence on its part or, that regardless of its negligence, the plane would still have been damaged by the storm.

"The term 'act of God' is used to designate the cause of an injury to person or property where such injury is due directly and exclusively to natural causes without human intervention, and could not have been prevented by the exercise of reasonable care and foresight. . . ." 65 C.J.S. Negligence § 21(b). Defendant in its answer did not raise this issue or specifically plead it as a defense. An "act of God" must be specifically pleaded. 65A C.J.S. Negligence § 197. Nevertheless, the trial court allowed defendant to introduce evidence on this question, and instructed the jury just as if an "act of God" had been specifically pleaded.

Of course, a plaintiff is not entitled to maintain an action unless the facts alleged constitutes a cognizable cause of action. An "act of God" alone is not a sufficient predicate for an action for damages. This Court, in defining an "act of God," has said: "The term 'act of God,' in its legal sense, applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them." *Midgett v. Highway Commission,* 260 N.C. 241, 132 S.E. 2d 599.

"Legal responsibility for negligence joined with an act of God depends upon the fact that the negligence operated as an efficient and contributing cause of injury. Otherwise, the case will fall within the rule that no action lies for an injury attributable to an unavoidable accident. 'One who is under a duty to protect others against injury cannot escape liability for injury of such others on the ground that it was caused by an act of God unless the natural phenomenon which caused the injury was so far outside the range of human experience that ordinary care did not require that it should be anticipated or provided against, and it is not sufficient that such phenomena are unusual or of rare occurrence.' 65 C.J.S. Negligence, p. 433." *Bennett v. R. R.*, 245 N.C. 261, 96 S.E. 2d 31, 62 A.L.R. 2d 785, cert. den. 353 U.S. 958, 1 L. Ed. 2d 909.

In *Kindell v. Franklin Sugar Refining Co.*, 286 Pa. 359, 363, 133 A. 566, 568, the Supreme Court of Pennsylvania tersely and accurately said: "He whose negligence joins with the act of God in producing injury is liable therefor." See also *Lawrence v. Power Co.*, 190 N.C. 664, 130 S.E. 735; *Comrs. v. Jennings*, 181 N.C. 393, 107 S.E. 312; *Ridge v. R. R.*, 167 N.C. 510, 83 S.E. 762; *Ferebee v. R. R.*, 163 N.C. 351, 79 S.E. 685.

We are of the opinion that the storm which occurred in the Charlotte area on the afternoon of July 23, 1962 was not so extraordinary that the history of climatic variations and other conditions of the particular locality afforded no reasonable warning of it. The storm was not "so far outside the range of human experience that ordinary care did not require that it should be anticipated or provided against." *Bennett v. R. R.*, *supra*. In fact, it appears from the defendant's own evidence that it had ample warning of the approach of the storm. All the defendant's witnesses placed the time at which the plane was moved at around 4 p.m., over an hour before the storm actually struck. One of the employees who moved the plane testified that at the time there were thunderheads building up from the north. Furthermore, it appears that there was weather information forecasting the storm available to the defendant, whether or not defendant actually took advantage of it. Also, one of defendant's own witnesses testified that he observed the plaintiff's plane at 5 p.m., and that it had not been tied down at all. The testimony of the defendant's witnesses who claimed that they actually tied the plane down was such that it could be reasonably inferred that the plane was tied down improperly and negligently. Defendant's evidence also indicates that of the 16 or 17 planes on its ramp, only two were blown loose by the wind.

It has been held that changes in the weather are conditions which

MILLS, INC. *v.* TERMINAL, INC.

the bailee of an aircraft is bound to anticipate as likely to occur. In *Zanker v. Cedar Flying Service, Inc.*, 214 Minn. 242, 7 N.W. 2d 775, defendant was in possession of plaintiff's plane under an arrangement which amounted to a bailment. The plane had not been in use on the day of the storm, but was outside on the field with its wheels blocked. It was not anchored or tied down. Evidence tended to show that there was room for it in the hanger but that the doorways to the hanger were blocked by one or two large planes on which repair work was being done. The airport was equipped with radio reception equipment but paid no attention on that morning to the weather report. The weather was threatening, but the thunderstorm and wind squall that damaged the plane did not develop until about noon. The storm started in the vicinity of defendant's airport and traveled to northeast Minneapolis, where it developed into a tornado. When the wind struck the airport it became necessary to move the two planes upon which the repair work was being done in order to put the outside planes into the hanger. Defendant put three other planes into the hanger. This took so much time that it did not reach plaintiff's plane in time to get it into the hanger before the wind struck with such force as to lift the plane into the air, causing it to make a complete loop and land with tremendous force on top of one of the large planes being repaired. In affirming a verdict and judgment for the plaintiff, the Court said: "Changes in weather are conditions which a bailee is bound to anticipate as likely to occur. . . . Care commensurate with such likely changes must be exercised, and the effect of high or squally winds upon a plane as light as a 'Piper Cub' must be taken into account by the bailee. We think the evidence was ample to sustain a finding of negligence on the part of the defendant."

In *Shephard v. Graham Bell Aviation Service, Inc.*, 56 N.M. 293, 243 P. 2d 603, plaintiff's airplane broke away from its moorings where defendant had secured it as part of a storage arrangement during a violent windstorm. The Civil Aeronautics Authority had given ample warning that the vicinity would be visited by very heavy winds on the day in question. Defendant's employees had tied the plane down with a "single tie" which proved insufficient to hold it. The wind was quite strong in the afternoon and reached a velocity of 90 miles an hour during the night. In affirming a verdict and judgment for the plaintiff, the Court said:

"We are satisfied if the defendant's manager, who was living not more than 100 yards from the place the plane was tied down, had heeded the warnings given him and followed the ex-

ample of a neighboring airport manager by putting additional ties on his planes and staying on the job as did his neighbor, the plaintiff's plane would not have been destroyed. On the contrary, he stayed in his house and, as found by the trial court, left the worry to the insurance carrier.

"A defendant may not find shelter behind the plea the injury was caused by an act of God when, but for his concurring negligence, the injury would not have occurred."

In *Rutledge v. Des Moines Flying Service, Inc.*, 254 Iowa 809, 119 N.W. 2d 262, plaintiff's plane overturned in a thunderstorm while parked in defendant's tie-down area. The relationship of the parties was that of bailor and bailee, the defendant having control of the plane for the purpose of repairing its radio. Plaintiff's plane was tied down by chains at each wing, but not at the tail. When defendant's agents saw the storm approaching, they checked the tie-downs on the planes, but still did not tie down the tail on the plaintiff's plane. The Court, in affirming a judgment and verdict for the plaintiff, said: "From the evidence the jury could find that the defendant's employees did not properly perform their duties of checking and securing planes in its area when a storm was approaching." It should be noted that one of the defendant's exceptions was to the failure of the court to allow its amendment to allege an "act of God." The Iowa Supreme Court held that the trial court was within its discretion in refusing to allow the amendment after trial commenced, pointing out that evidence in support of the defense of an "act of God" was admitted by the trial court and was before the jury on the question of proximate cause, and that the denial of the amendment could not have seriously prejudiced the defendant.

In *Alamo Airways, Inc. v. Benum*, 78 Nev. 384, 374 P. 2d 684, the main question presented to the Supreme Court of Nevada was whether the bailee had sustained the burden of proving that damage to the bailed airplane was due to causes consistent with due care on its part. The Court held that the bailee of a bailment for hire of an airplane delivered to the bailee for storage in the bailee's "tie-down area" was liable for damage to the bailed airplane because of its negligence in using inadequate tie-downs to withstand the pressure of anticipated winds where the wind which damaged the plane could have been, and was foreseen. Plaintiff's plane was stored in defendant's open tie-down area and defendant's employees performed the tie-down procedures. The plane was tied down by chains at each wing and the tail. The chains were attached to the tie-down rings on the underside of the plane by use of "S" hooks. Weather condi-

tions were described by the Nevada Court as follows: "The morning of July 28, 1958, was calm. Hourly readings by the United States Weather Bureau at the airport, a short distance from where the planes were moored, registered from calm to ten knots an hour. At noon it was again blowing five knots and characterized as light. A thunderstorm, typical to a July day, came up around noon or 1 o'clock 'as is normal in such thunderstorm conditions.' Such storms are common in that area at that time of the year. The United States Weather Bureau attendant characterized it as 'a common thunderstorm.' The weather bureau reported early that morning that there would be winds all that day. On the preceding day, July 27, it reported that there would be high winds all day on the 28th. At 12:45 p.m. the wind registered forty-one knots and at 1:25 p.m., forty knots." Plaintiff's airplane was torn loose from its moorings, and severely damaged. Two other planes owned by defendant were likewise torn loose and damaged. It was demonstrated both by testimony of witnesses and photographs that the "S" hooks had been stretched out almost straight. Nothing in the evidence indicated that the plaintiff's plane would have been torn loose if the "S" hooks had remained intact. The Court said that although there was some testimony to the effect that the high wind was a "twister," there was also substantial evidence to the contrary. The Nevada Court further said: "Where it is contended that the damage resulted from an act of God, such act, to avail the defendant, must be such a providential occurrence or extraordinary manifestation of the forces of nature that it could not reasonably have been foreseen, and the effect thereof avoided by the exercise of reasonable prudence, diligence and care, or by the use of those means which the situation renders reasonable to employ." The Court said that ordinary and reasonable precautions would require the use of "S" hooks that would not straighten out by reason of a foreseeable wind pressure applied to the plane. A verdict and judgment for the plaintiff was affirmed.

Plaintiff's evidence, and defendant's evidence favorable to plaintiff, would permit, but would not compel, a jury to find as a reasonable inference that defendant had, or in the exercise of ordinary care, could have had ample warning of the approach of the storm and negligently failed to secure properly plaintiff's plane against the expected dangerous weather condition. Proximate cause is ordinarily a question for the jury. It is to be determined as a fact from the attendant circumstances. Conflicting inferences of causation arising from the evidence carry the case to the jury. *Pruett v. Inman,* 252 N.C. 520, 114 S.E. 2d 360. Interpreting plaintiff's evidence with that degree of liberality required on motions for judgment of compulsory

nonsuit, we think, and so hold, that plaintiff's evidence, and defendant's evidence favorable to plaintiff, makes out a *prima facie* case of actionable negligence against defendant, which defendant's evidence does not affirmatively, clearly, and unambiguously rebut, and that on the facts of the instant case decision on the motion for judgment of compulsory nonsuit is controlled by our decisions in *Electric Corp. v. Aero Co., supra; Dellinger v. Bridges, supra; Insurance Co. v. Motors, Inc., supra; Wellington-Sears Co. v. Finishing Works, supra; Oil Co. v. Iron Works, supra; Hutchins v. Taylor Buick Co., supra; Beck v. Wilkins, supra.* The facts are distinguishable from the facts in *Swain v. Motor Co., supra,* and *Morgan v. Bank, supra.* The trial court correctly overruled defendant's motion for judgment of compulsory nonsuit at the close of all the evidence.

Defendant assigns as error the alleged failure of the court to charge the jury that there would be no liability if it found that the "act of God" was of such overwhelming and destructive character that it would have produced the damages in question, regardless of any negligence on the part of the defendant. As stated earlier, defendant did not plead an "act of God." Defendant was nevertheless allowed to introduce evidence in support of such a defense, and the court charged the jury as to the defense. The charge is free from prejudicial error. The trial judge charged, in substance, that one is not liable for damages caused by an "act of God" where there is no fault or negligence on his part; that one whose negligence joins with the "act of God" and is one of the proximate causes of the injury or damage is liable therefor; that the plaintiff could not recover if the sole proximate cause of plaintiff's damage was the "act of God," *i.e.,* the storm; that if the defendant was negligent and if such negligence joined with the storm as one of the proximate causes of plaintiff's damages, then defendant would be liable; and that the burden of proof was on the plaintiff to satisfy the jury by the greater weight of the evidence that the defendant was negligent and that such negligence was a proximate cause of the plaintiff's damages.

It appears, therefore, that the trial judge made it clear in his charge that for the plaintiff to prevail any negligence by the defendant would have to be a proximate cause of the damages. In *Vincent v. Woody, supra,* Barnhill, J. (later C.J.), writing for the Court said:

> "Ordinarily the presiding judge must instruct the jury extemporaneously from such notes as he may have been able to prepare during the trial. To require him to state every clause and sentence so precisely that even when lifted out of context it expresses the law applicable to the facts in the cause on trial

with such exactitude and nicety that it may be held, in and of itself, a correct application of the law of the case would exact of the *nisi prius* judges a task impossible of performance. The charge is sufficient if, when read contextually, it clearly appears that the law of the case was presented to the jury in such manner as to leave no reasonable cause to believe that it was misled or misinformed in respect thereto."

Such is the case here. The charge, when read as a composite whole, leaves us with the impression that the jury must have understood that the defendant was liable only for damages which proximately resulted from its negligence.

Defendant also assigns as error the trial court's allowing plaintiff's witness, Mr. Connell, when he was recalled as a witness for plaintiff after defendant rested, to answer questions as to what, in his opinion, would have happened to the tail wheel assembly and the polished metal cylinder on the main landing gear if the wind had blown against the plane with enough force to straighten out the "S" hooks on the chains allegedly used by the defendant. Mr. Connell stated that there would have been, in his opinion, some very deep dents in the cromolic tubing on the tail wheel assembly and the paint would have been peeled off in the area where the chain came in contact with the tubing, and that there would have been deep scratches caused by the chain in the chrome finish on the main gear strut assembly, and that in making his examination he found no such indications. Defendant contends that this evidence was prejudicial on several grounds: that the witness was not an expert; that his testimony was not in response to a proper hypothetical question; and that by stating what would have happened his testimony invaded the province of the jury. Sharp, J., said the following for the Court in *Teague v. Power Co.*, 258 N.C. 759, 129 S.E. 2d 507:

". . . Nevertheless, the rule with us is that the failure of the trial judge to specifically find that the witness is an expert before allowing him to give expert testimony will not sustain a general objection to his opinion evidence if it is in response to an otherwise competent question, and if there is evidence in the record on which the court could have based a finding that the witness had expert qualifications. In such a case, it will be assumed that the court found the witness to be an expert; otherwise, it would not have permitted him to answer the question. Stansbury, Evidence, § 133; *State v. Coal Co.*, 210 N.C. 742, 188 S.E. 412; *Summerlin v. R. R.*, 133 N.C. 551, 45 S.E. 898; *Brewer v. Ring and Valk*, 177 N.C. 476, 486, 99 S.E. 358.

"When the opinion of a witness is called for before the court has made a specific finding that he is an expert, if counsel wish to question the witness' qualifications, they should object specifically on this ground. If they confined themselves to a general objection it will be considered as applying only to the competency of the particular question; but the rule is otherwise if there is no evidence of the witness' special knowledge or expert qualifications. *State v. Secrest,* 80 N.C. 450; *Bivings v. Gosnell,* 141 N.C. 341, 53 S.E. 861."

Defendant's objections to the questions asked the witness were general objections and were not based on the witness' qualifications to answer the questions. While it is true the trial court did not specifically find that Mr. Connell was an expert, there is an abundance of evidence in the record, which we have stated above, showing that Mr. Connell had the requisite skill, experience, and learning to qualify him as an expert on the subject about which he testified; and that he was better qualified than the jury to draw appropriate inferences from the facts. When Mr. Connell was first on the stand in plaintiff's behalf, he testified as an expert witness without any objection by defendant. It was only after defendant had rested and Mr. Connell was recalled to the stand by plaintiff that defendant offered any objection to his testimony. It must be borne in mind that Mr. Connell examined the damaged plane and was testifying in part on what he saw and in part as an expert witness. Furthermore, defendant's own witness testified on cross-examination, without objection by defendant, that if a chain pulled against the painted surface of the strut or the polished metal, it would mark it. This was substantially the same evidence to which defendant later objected. An objection is waived when evidence of the same import is admitted without objection. *Dunes Club v. Insurance Co.,* 259 N.C. 294, 130 S.E. 2d 625; *Teague v. Power Co., supra; In re Will of Knight,* 250 N.C. 634, 109 S.E. 2d 470. While counsel's questions and defendant's answers might have been more precisely worded, it is clear that the evidence was the statement of the witness' opinion and that the jury could only have considered it as such. *Teague v. Power Co., supra.* In view of the above facts, the testimony of witness Connell was not prejudicial to the defendant.

In the trial below we find

No error.

HUSKINS, J., took no part in the consideration or decision of this case.