BESSEL, TRUSTEE *v.* DEPARTMENT OF FINANCIAL
INSTITUTIONS ET AL.

[No. 26,937.  Filed December 20, 1937.  Rehearing
denied March 10, 1938.]

*Walter R. Arnold,* for appellant.

*Roland Obenchain,* for appellees.

FANSLER, J.—The Union Trust Company of South Bend was the trustee of an express trust in certain real estate. For convenience, this trust will be referred to as the "Hartzer trust." The trust company is now in process of liquidation by the Department of Financial Institutions. Nathaniel R. Bessel was appointed trustee to succeed the Union Trust Company. Upon the appointment of the new trustee, the Department of Financial Institutions, in charge of liquidation, filed a report, accounting for the management of the business of the trust by the Union Trust Company. Appellant filed exceptions to the report. The cause was tried without a jury. There were special findings of fact and conclu-

sions of law, and a judgment that the trust was indebted to the Department of Financial Institutions, as liquidator of the Union Trust Company, in the sum of $9,961.22, which amount was declared to be a first lien on the property of the trust.

Error is assigned upon the overruling of appellant's motion for a new trial, and upon the conclusions of law.

On November 28, 1923, Frank W. Hartzer and the Securities Investment Corporation entered into an agreement with the Union Trust Company, by the terms of which certain real estate, platted suburban additions, owned by Hartzer and the Securities Investment Corporation, was conveyed to the trust company for the benefit of the grantors and the Jefferson Improvement Company, with the provision that the grantors might sell parcels of the real estate from time to time, retaining a portion of the sale price to cover expenses, the remainder of the purchase price to be turned over to the trustee; that the money turned over to the trustee should be disbursed (1) to reimburse the trustee for costs, expenses, and compensation; (2) to meet the semiannual interest due upon a mortgage upon the real estate; and (3) to the payment of street assessments and taxes accruing. It was agreed that 15 per cent of all money received by the trustee should be set aside in a street improvement fund, the proceeds to be used to meet street improvement assessments. There was also a provision for the distribution of certain amounts to the trustors. The purpose of this trust agreement was to make possible the sale of lots, and the realization of income therefrom by the grantors, and the gradual reduction and payment of the mortgage incumbrance. On October 1, 1926, a trust deed was executed by Hartzer and wife, the Jefferson Improvement Company, and the Securities Investment Corporation, all of whom were designated in the instrument as borrowers, to the Union

Trust Company, for the property remaining in the trust above described. It is recited that the purpose of the conveyance is to lodge title to the real estate in the Union Trust Company, in trust, for the purpose of procuring funds with which to pay off the balance of the mortgage, which was a lien on the real estate, and to derive funds to pay off other indebtedness, and to release money for distribution among the borrowers. The instrument provides for a bond issue of $200,000, all or most of which seems to have been sold. The bonds were secured by the trust indenture. It seems that the mortgages and other liens theretofore on the property were paid. The Union Trust Company in its private capacity became the owner of some of the bonds. There were provisions for the sale of lots, and the application of the money to the payment of taxes and other liens, and principal and interest on the bonds, as they matured. The trustee was to apply the money coming into its hands to the payment of interest and principal upon maturing notes, and to the payment of taxes and assessments, and the surplus, after paying current items, was to be used in calling and retiring notes and bonds before maturity. It was assumed that the collections from the sale of lots would provide sufficient funds in the hands of the trustee to meet accruing interest, current maturities, taxes, assessments, etc. In case of deficiency in these funds, the borrowers agreed to pay to the trustee sufficient additional money to meet those obligations, and it was agreed that, if the borrowers should fail to advance money for deficiencies, the amount thereof would draw interest at 8 per cent until the delinquency should be removed. There is a provision that: "The trustee may, but is not required to, after such default advance the delinquent amount out of its own funds, and the same, together with interest thereon as aforesaid, shall be a first charge upon moneys coming into its

hands until the trustee shall be fully reimbursed"; and a provision that, upon default in principal or interest payments which shall continue for a period of 90 days, the bondholders may at their option, declare the entire amount of their obligations due, in which event the trustee shall foreclose the equity of redemption of the borrowers; and, "after deducing from the proceeds of such foreclosure the proper allowance for all expenses thereof, including attorney's fees, and all expenses or advances which may have been made or incurred by the said trustee in respect to the said property, or .in the discharge of its trust, as well as reasonable compensation for its own services, the trustee shall apply the proceeds to the payment of such notes."

There were delinquencies, and the trust company made advancements, which, on June 25, 1930, aggregated $80,640.57. It will be noted that, under the contract, the trust was indebted to the trustee for these advancements, and the Union Trust Company, in its private capacity, held a first lien upon all the property of the trust for reimbursement, and was entitled to be reimbursed out of current income or, upon foreclosure, out of the proceeds of the sale before payment of the mortgage. On June 25, 1930, the Securities Investment Corporation was indebted to the Union Trust Company, independent of the trust transaction above described, in the sum of $29,986.87, and the Jefferson Improvement Company was also otherwise indebted to the Union Trust Company in the sum of $8,408.66. It is found as a fact that, on that date, the Union Trust Company demanded security in addition to that held by it, and that thereupon there was simultaneously signed and delivered to the Trust Company three written instruments, the first a promissory note in the sum of $80,640.57, payable two years after date, with interest at the rate of 7 per cent. per annum, signed by the Securities Invest-

ment Corporation and the Jefferson Improvement Company, which recites that certain collateral is deposited therewith, which is described as: "Trust agreement dated June 25th, 1930, between Securities Investment Corp. and Union Trust Company and assignment dated June 25th, 1930, between Jefferson Improvement Company and Union Trust Company." It is found that the assignment mentioned is lost, and there is no evidence of its contents. The trust agreement between the Union Trust Company and the Securities Investment Corporation recites that, whereas, on the 28th day of November, 1923, the Securities Investment Corporation, Frank W. Hartzer, and the Union Trust Company entered into the agreement heretofore referred to, conveying certain real estate, and that, whereas, on the 26th day of July, 1924, the Securities Investment Corporation, Hartzer, the Jefferson Improvement Company, and the Union Trust Company entered into a trust agreement, which has been above referred to, and, whereas, said parties entered into a certain trust agreement dated October 1, 1926, concerning the same properties, "all of which trust agreements are incorporated herein by reference," and, whereas, for the protection of itself and other owners of notes secured by the trust agreement, "the Union Trust Company has been compelled to advance the sum of Eighty Thousand Six Hundred Forty and 57/100 ($80,640.57) Dollars for the payment of taxes, assessments, interest, insurance, principal payments, repairs and upkeep on said properties and whereas said Securities Investment Corporation and said Jefferson Improvement Company are each liable to said Union Trust Company for all or any part of said sum," and, whereas, the Securities Investment Corporation and the Union Trust Company have entered into other trust agreements, describing them, and, whereas, the Union Trust Company holds mortgages on all of the properties here-

inafter set forth, and is threatening to foreclose, and, whereas, the Securities Investment Corporation desires an extension of time in which to make payments of deficiencies, and, whereas, the Union Trust Company demands security in addition to that given in said trust agreements to secure the payment of $80,640.57, and a further sum due from the Securities Investment Corporation of $29,986.87, therefore, "to secure the said Union Trust Company for the repayment of said sum of One Hundred Ten Thousand Six Hundred Twenty-seven and 44/100 ($110,627.44) Dollars advanced as aforesaid by said Union Trust Company, the receipt whereof is hereby acknowledged, first party has by warranty deed of even date herewith, conveyed to said Union Trust Company" certain real estate, which is then described, subject to incumbrances thereon, it was agreed that the trust should remain in force "until all debts and obligations owing by first party hereunder shall be liquidated."

On June 29, 1930, the following entry was made upon the records of the Union Trust Company, in respect to the transaction of June 25, 1930: "Overdraft to 6/25/30 $78,810.35; interest on overdraft to 6/25/30 $1,830.22; secured by trust agreement of 6/25/30 and assignment of Jefferson Improvement Company 6/25/30 and two year note given for this $80,640.57." The advancements by the Union Trust Company to the trust had been carried on its books as an overdraft, and it is found by the court that: "By said entry the trust account appeared to be balanced." It is further found: "Said note was on June 29, 1930, entered on the notes receivable record of the Union Trust Company in its individual capacity and thereafter appeared in its records as an asset of said trust company individually." It is found by the court that the $80,640.57 was not paid by the transaction of June 25, 1930; that: "Said Union Trust

Company did not intend to and did not accept said note of that date in satisfaction and discharge of said overdraft and interest, but did intend to, and did, accept the same as further security. Said Union Trust Company did not intend to, and did not, surrender any lien or charge granted it by said agreement of October 1, 1926, for the disbursements giving rise to said overdraft."

Pursuant to these findings, credit was allowed for the $80,640.57 as a lien against the property of the trust, and this allowance is the basis of error assigned.

Appellant contends that, where a negotiable promissory note is given for an existing indebtedness, the presumption in law is that payment was intended and a new indebtedness created, and that therefore, by accepting the note of June 25, 1930, the indebtedness of the Hartzer trust to the trust company for advancements was wiped out, and that thereby the trust company lost its lien and right to claim reimbursement from the assets making up the body of the trust. Appellant recognizes, however, that such a presumption is rebuttable, and that the real intention of the parties, if established, is controlling. Appellant contends that the trust company was not a creditor of the trust as a result of the advancements, but in this he is clearly in error. While it is true that the trustors were responsible for advancements made by the trust company to the trust, the trust agreement expressly provides that, for reimbursement for such advancements, the trust company was to have a first lien upon the property of the trust. Appellant also stresses the fact that the trust company kept the note, and the collateral mentioned in the note, among the assets of the trust company, and not among the assets of the Hartzer trust, and that it was entered upon the books of the trust company as an assest of the trust company, and not of the Hartzer trust. But it could not have been otherwise. The in-

debtedness of the trust to the trust company for the advancements was an asset of the trust company in its corporate capacity, and not its asset as trustee of the Hartzer trust. Appellant also stresses the entry on the books of the trust company, by which the overdraft on the checking account of the Hartzer trust was balanced by the note in question. But this would seem to be of little significance. A more or less permanent overdraft of $80,000 is at least unusual, and to carry a loan of more than $80,000 as an overdraft is at least unorthodox. The trust agreement executed by the Securities Investment Corporation, contemporaneously with the execution of the note, clearly and conclusively indicates the intention and understanding of the parties. The purpose of the entire transaction was to give the trust company additional security, and not less security. The companies that signed the note were already obligated to pay indebtedness by the Hartzer trust agreement, so that, in signing the note, those companies did not further obligate themselves, and their note of itself furnished no additional security. The collateral referred to in the note consisted of the trust agreement mentioned and the lost assignment. The property held in various trusts, which was the foundation of this collateral, was also mortgaged, and only the equities of the companies were pledged. This, then, must have been the additional security. But if the security furnished by the first lien upon the property held in the Hartzer trust was to have been abandoned, the transaction would have resulted in the trust company taking other and different security, and not additional security as recited in their signed contract. It will be noted, also, that the security which the trust company already had consisted of a first and prior lien upon property which was the basic security for more than $100,000 of outstanding bonds, while the additional collateral pledged with the note consisted of

equities, and the interest pledged was subject to underlying mortgages. It seems unlikely that the trust company intended to voluntarily relinquish its first lien upon the property in the trust in order to accept in lieu thereof a junior lien upon a group of miscellaneous properties. It appears from the special findings that Frank W. Hartzer, Jefferson Improvement Company, and the Securities Investment Corporation were on June 25, 1930, and have ever since been, insolvent, and that they have no property subject to execution, and that "the properties conveyed under said transaction of June 25, 1930, were heavily burdened with mortgages, public improvement liens and taxes." In the light of these facts, it seems inconceivable that the trust company intended to abandon its first lien, its real security, in exchange for a worthless note, secured only by equities in heavily burdened properties, even if the express statements of the parties in their contract did not conclusively establish a contrary intention.

Appellant called as a witness a former assistant trust officer of the trust company, and offered to prove by him that, prior to the 25th day of June, 1930, pursuant to the orders of the banking department and its examiners, the Union Trust Company called in officers of the Jefferson Improvement Company and the Securities Investment Corporation, and demanded that the overdraft be taken care of, and offered to loan to those companies on securities then agreed upon, and which were subsequently described in the agreement of June 25, 1930, an amount sufficient to wipe out the overdraft indebtedness. The evidence was not admitted. If there had been such an agreement, it was not carried out, since the written agreement of June 25, 1930, expressly declares that the transaction was for the purpose of furnishing further security for the existing indebtedness and that a new loan on new security was not

contemplated. If there had been such an agreement prior to June 25, 1930, it was not carried out, and was not the agreement under which the note was given and the additional security furnished. Appellant also offered to prove by the same witness that after June 25, 1930, the Union Trust Company did not carry on its books any claim, account, or credit in its own favor against the Hartzer trust. An objection was sustained, which might be justified on several grounds. The question called for a conclusion of the witness, at least as to the effect of the entry, concerning the overdraft, made on June 29, 1930. That entry shows that the overdraft was secured by the trust agreement and the assignment made on that day, "and two year note given for this $80,640.57." It was for the court to determine whether this entry was a charge against the trust; and if there were other entries they might have been proven, or it might have been proven that there were no other entries concerning the matter, so that the court might determine the effect of the entries.

On September 30, 1926, the trustee distributed the sum of $15,250 out of the trust fund, by check payable to "Lincoln Terrace." It seems that "Lincoln Terrace" was a subdivision, but that the check was actually delivered to Mr. McInerny, secretary of the Jefferson Improvement Company. This distribution was made the day before the new trust agreement was entered into, pledging the real estate as security for the bond issue. The new trust agreement makes no mention of cash being pledged. Appellant contends that the distribution was in violation of the provisions of the trust of November 28, 1923, which required segregation of 15 per cent. of the trust receipts for the payment of public improvement assessments. But the court expressly found that the trustee did not fail to set aside 15 per cent., and no evidence, or lack of evidence, is pointed to as indi-

cating that the finding is incorrect. The trust agreement in question provides that at any time there is in the hands of the trustee a surplus not arising out of the street improvement fund, and not required to meet current interest, taxes, and assessments, coming due within the ensuing six months, a distribution of funds might be made to Mr. Hartzer, the Securities Investment Corporation, and the Jefferson Improvement Company. The check in question was delivered by Mr. McInerny, who was an officer of both corporations. The evidence shows that the check was drawn on an order bearing the notation, "Distribution of funds upon making new trust agreement." Mr. Hartzer and the two corporations seemed, from the contract, to have been closely related in the real estate transaction involved. Neither the corporations, nor Mr. Hartzer, nor his estate are complaining that they did not receive their share of the distribution, and the evidence indicates that the fund was available for distribution. No basis is seen for complaint by the beneficiaries of the current trust, or by the current trustee.

In 1928, with the consent and active participation of the Securities Investment Corporation, the Union Trust Company as trustee made and carried out a contract for the sale of more than 90 of the vacant lots covered by the trust deed, for a consideration of $43,000. The trustee received $34,000 in cash, which was credited to the trust, and accepted for the balance of $9,000 a piece of real estate with a building thereon, which the court, in its special findings, found to have been of the fair value of $25,000, subject to a mortgage incumbrance of $16,000. The court found that at the time of the transaction the fair rental value of the building was $325 per month. It was also found that, after this transaction, conditions changed rapidly; rents on the building declined and finally stopped completely with

the payment of June 14, 1929. The trustee made payment on the mortgages until August, 1930, and paid fire insurance premiums and the expenses of repairs and maintenance. Shortly thereafter the mortgages were foreclosed and the trustee was dispossessed. During the period of possession of the premises, the trust company received rental amounting to $1,575. It expended $690.61 for repairs, and $325.92 for insurance, and paid principal and interest on the mortgage indebtedness on the building amounting to $4,819.02. The total disbursements were $5,835.55, leaving a deficit from the operation of the building of $4,260.55. All of these receipts and disbursements were found to have been credited to or charged against the trust estate. The court allowed the charges.

Appellant complains that, under the terms of the trust, the trustee's powers in respect to the property were limited to sales, leases, or disincumbrance of liens existing at the time the trustee took title and superior to the trustee's rights; that the transaction was in violation of the trustee's duties; and that the trustee should be charged with the loss of $4,260.55. It may be noted in passing that, in the case of a similar transaction, the trustee showed net receipts on a piece of property of $1,270.49. It is clear that, under the contracts, the so-called borrowers had broad powers to effect sales and the disposition of the vacant lots, which principally made up the trust property. The minimum prices at which the lots were to be disposed of were fixed in a schedule attached to the trust agreement, but by clause 7, it was provided that any lot or lots might be released from the trust upon payment to the trustee of an amount equal to 40 per cent. of the selling price of the lot or lots shown upon the schedule. The transaction in question was arranged by the officers of the borrowers, and not by the trust company. In the schedule, the lots sold

were valued at something less than $45,000. Had the trust company refused to enter into the contract, the lots could have been withdrawn upon payment of $18,000, and the borrower companies might have made the sale upon the same consideration, in which event the trust would have received only $18,000, rather than $34,000, in cash. While the contract does not expressly provide that sales may be made for part cash and part exchange of property, it does not prohibit such transactions. The trust agreement also provides that lots may be sold at the scheduled price, and the purchase price delivered to the trustee, less 25 per cent. for commissions. Thus, the lots might have been sold for $45,000, $33,750 in cash accounted for to the trust company, and the balance retained by the borrowers who arranged the sale, and it would be immaterial to the beneficiaries of the trust whether this balance deducted for commission was received in cash or in property. It is not suggested that the transaction was not carried out in the utmost good faith. In fact, the trust company was a considerable holder of the bonds secured by the mortgage. The trust had the benefit of the $34,000, less the loss of $4,260.55, or more than $29,000. If the transaction had not been consummated, the trust would still own the vacant lots, which produced no income, were subject to recurrent taxes, and which, doubtless, also depreciated greatly in value after 1929. It is thus clear that the trust received more net cash from the transaction than it might have received if the trust company had refused to make the sale and had relinquished the lots to the borrowers, and, probably, more cash than would have been received by the trust if the vacant lots had been held for sale at depression prices, and subject to recurrent tax burdens. Even if it can be said that the trustee exceeded its powers, under a strict construction of the contract, equity will not penalize for the mere

technical violation where the transaction was in good faith and no injury is shown. Under the facts here, it might well be said that the transaction resulted in a positive benefit to the trust.

In the first trust agreement it was agreed that the trustors should have the right to sell the lots involved and make collections therefor, and that the trustee should not be responsible for any funds handled or collections made by the selling agents employed by the trustors, except as to money actually coming into the possession of the trustee. The court found that in eight instances some employee of the Securities Investment Corporation actually received payments from purchasers to apply on their installment purchase contracts, and credited the same upon the purchasers' copies of the contracts, but did not credit the same upon the vendor's copies of the contracts, or upon any record of the Securities Investment Corporation, or deliver the money to the Union Trust Company. Thereafter the purchasers completed their payments, and made over-payments equal to the amounts above referred to. Upon discovery of this fact, the trust Company refunded the amounts involved, aggregating $855.15, out of the funds of the trust, and took credit for these amounts in the report. The court held that the amount should be allowed. Since the payments were made by the purchasers through mistake as to the state of their accounts, it cannot be doubted that they could have recovered the amount of the over-payments; and hence, in repaying them out of the funds of the trust, the trustee did only that which it would have been required to do at the suit of the purchasers. The payments were made to agents of the Securities Investment Corporation, which was authorized by the trust agreements. The trust agreements provide that the trustee shall be responsible only for monies that come into its hands.

These collections did not come into the hands of the trustee. Appellant contends that the collecting agents were the agents of the trustee, and that the trustee is responsible for their defalcation, but the agreement provides otherwise. It is further provided that the trustors shall be responsible to the trustee for collections made by their agents, which are not accounted for, but the trustors are expressly found to be insolvent, and there is no finding that the trustee was negligent in pursuing its remedy against them, or that the claim could have been collected from them.

We find no error.

Judgment affirmed.