The UNITED STATES LIFE INSUR-ANCE COMPANY IN the CITY OF NEW YORK and Ministers Life, a Mutual Life Insurance Company, f/k/a Ministers Life and Casualty Union, Appellants,

v.

MECHANICS & FARMERS BANK, Appellee.

The UNITED STATES LIFE INSUR-ANCE COMPANY IN the CITY OF NEW YORK and Ministers Life, f/k/a Ministers Life and Casualty Union, Appellees,

v.

MECHANICS & FARMERS BANK, Appellant.

Nos. 81–2007, 81–2010.

United States Court of Appeals, Fourth Circuit.

Argued March 1, 1982.

Decided Aug. 10, 1982.

---

E. D. Gaskins, Jr., Raleigh, N. C. (Renee J. Montgomery, Cynthia Wittmer West, Sanford, Adams, McCullough & Beard, Raleigh, N. C., on brief), for appellants in No. 81–2007 and appellees in No. 81–2010.

Carl N. Patterson, Jr., Raleigh, N. C. (Henry A. Mitchell, Jr., Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, Raleigh, N. C., William A. Marsh, Marsh & Banks, R. Roy Mitchell, Jr., Nye, Mitchell, Jarvis & Bugg, Durham, N. C., on brief), for appellee in No. 81–2007, and appellant in No. 81–2010.

Before RUSSELL and HALL, Circuit Judges, and JAMES C. CACHERIS, United States District Judge for the Eastern District of Virginia, sitting by designation.

DONALD RUSSELL, Circuit Judge:

This is an action by bondholders to recover of the defendant bank, an indenture trustee, damages arising out of alleged violations of its fiduciary duties. By agreement, the cause was tried to the court without a jury. After trial, the district court filed its "Memorandum of Decision," in which it found certain breaches of the duties on the part of the bank as trustee, rendered judgment against the trustee on account of certain such breaches, and denied judgment on others. Both the bondholders and the trustee have appealed. The bondholders contend on their appeal that the damages awarded them were inadequate; the trustee challenges the findings of breaches by it of its fiduciary duties and the award of damages against it. We affirm.

The creditor was a small private college, founded in 1947 as a business college, located in Durham, North Carolina. By 1970 it had expanded into an academic college, with a student body, all black, of approximately 400 students. At least 95% of its students financed their schooling through various federal student assistance programs. 85% of the students lived on the college campus. The college, however, had limited housing facilities, particularly for male students. As a consequence, 40% of the men students were housed in private homes. The college authorities anticipated that if they had increased dormitory facilities for both male and female students, they would be able to attract additional enrollment and improve generally their operations. They accordingly prepared plans for the construction of an additional dormitory to accommodate 200 students.

To finance this dormitory project, the college authorities contacted several securities underwriters. After consulting these underwriters, the college determined to issue bonds in the amount of $550,000, se-

cured by an indenture and deed of trust covering the proposed dormitory. On the basis of information furnished them as well as information developed by them independently, the underwriters prepared a "Confidential Memorandum" for prospective purchasers of the bond issue. In this "Memorandum," the underwriters emphasized that the college was participating "in all federally sponsored financial assistance programs" and concluded with the opinion that the proposed project would qualify under the "1 Billion Dollar L.I.A.A. Urban Program, . . . as an Urban Investment." Under this "Urban Program," the insurance industry (which included the two bondholders herein) undertook voluntarily to channel funds "into urban areas where financing previously had not been available" by making certain qualifying "high risk" loans for the purpose of aiding small business and minority urban development.

The underwriters successfully placed the entire issue of $550,000 of bonds with the plaintiffs, The United States Life Insurance Company (hereafter "U. S. Life") and Ministers Life, a Mutual Life Insurance Company (formerly Ministers Life and Casualty Union), (hereafter "Ministers Life"), in the respective proportions of 54.4% and 45.5%. Before agreeing to purchase such bonds, the lenders (at least the U. S. Life) obtained written confirmation from the Administrator of Urban Affairs of the Life Insurance Association of America that the proposed bonds "qualif[ied] for inclusion within the $2 billion urban investment program." The bonds, dated January 1, 1970, were secured by a trust indenture, representing a first mortgage over the proposed dormitory, and bore an annual interest rate of 9¼% payable semi-annually on July 1 and January 1 of each year, with principal, payable over a period of twenty years beginning with annual principal payments of $10,000 for the first three years of the loan, on January 1 of each year, the first payment being due on January 1, 1971. The trust indenture provided for the creation by the college of three funds with the trustee in order to facilitate the payments to be made under the bonds. The first two were intended to assure the periodic monthly accumulations from the "Gross Revenues" of the college of sufficient sums to meet when due the next agreed annual principal and semi-annual interest payments under the indenture. These were designated in the indenture as the "Interest Fund" and the "Sinking Fund." The third, designated in the indenture as the "Reserve Fund," was to be established "upon the issuance of the Bonds" by the deposit with the trustee of $50,000 to be used only for final payment of the bonds in 1990 or in the event the other funds on deposit with the trustee were insufficient to meet a scheduled payment of principal and interest. If any part of the "Reserve Fund" was used for the latter purpose, replenishment was to be made by the college within 90 days.

Under the indenture the responsibilities of the trustee were spelt out in precise detail. The trustee was to be liable "prior to an event of default hereunder" *only* "for the performance of such duties and obligations as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee." "[I]n event of default" by the college the indenture provided that the trustee from that point was to "exercise such rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." The trustee was further given the benefit of an exculpatory provision to the effect that "[t]he Trustee shall not be liable for any error of judgment made in good faith . . . unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts." The trustee was expressly authorized to "acquire and hold, or become the pledgee of, Bonds and coupons and otherwise deal with the [College] in the manner and to the same extent and with like effect as though it were not Trustee hereunder."

From the outset, the bonds were understood by the purchasers to be a "high-risk" investment and for this reason they were

not rated. The general counsel of Ministers Life, in a memorandum prepared in April, 1979 for his Board of Directors, described the investment in the bonds as "clearly not an investment quality venture" and indicated that such was the feeling of the "Investment Committee" of the company at the time the investment was approved. This opinion on the quality of the bonds was quickly confirmed by the college's experience in complying with the requirements of the indenture. Under the indenture, the college was to begin paying "once each calendar month," beginning with September 1, 1970, (1) an amount equal to $\frac{1}{6}$ of the aggregate semiannual interest becoming due and payable on the bonds on the next succeeding interest payment date into the "Interest Fund" and (2) an amount equal to $\frac{1}{12}$ of the amount next due to be placed in the "Sinking Fund" to be used to retire bonds in accordance with a schedule set forth in the "Sinking Fund" provision of the indenture. When the college failed to begin making these payments into the two "Funds" as provided in the indenture, the trustee wrote the college, asking compliance. The president of the college replied to this demand by first stating that the college's collections, though adequate to meet the required payments, were not coming in at the times anticipated when the indenture was executed. He explained that this delay was occasioned by a change in the timing of payments under the student assistance programs of the federal government. He assured the trustee that the college would make the payments into the two "Funds" within time to cover interest and principal retirement payments as those accrued under the indenture. The trustee accepted the college's explanation and the two payments were made into the "Funds" on or before the date fixed under the indenture for the first payment of interest and the initial retirement of bonds.

The problem which arose in connection with the September 1, 1970 payments became a recurring one in the dealings between the college and the trustee. To an extent, the problem was accentuated by losses in enrollment by the college. According to Dr. Hill, the president of the college, the state-financed community college program "came fairly well into place" at this time and siphoned off "quite a number of students" in the '70, '71 and '72 years. Nonetheless, the college was able to provide the trustee with funds to meet, when due, the payments on interest and principal retirement to be made by the trustee until January 1, 1972. On that date the college, indicating that at the moment it was without the full amount required to make the payments then provided for under the indenture, began a practice of requesting the trustee to permit a temporary withdrawal from the "Reserve Fund" to cover a part of the semi-annual payments of interest and bond retirement. It assured the trustee that it would shortly replace the withdrawal and certainly within the 90 days allowed under the indenture. It apparently did restore, in whole or in part, the early withdrawals from the "Reserve Fund." Later, however, the problems of the college seem to have grown. They became acute "[i]n the fall of '76" when the federal government tightened its standards for student assistance. The result of this was that the college "had to deallocate, meaning we had to tell about 200 students that [the college] did not have enough financial aid for them, so they would have to go home." This, according to Dr. Hill was "actually the beginning of [the college's] real financial problem," ending up that year "with about $200,000 plus in accounts receivable [it] could not collect." By December, 1977, the college was without funds and it had borrowed and not replenished from the "Reserve Fund" to such extent that there was nothing left in that Fund. It accordingly notified the bank by letter dated December 28, 1977 that it would be unable to meet the interest and bond retirement payments due on January 1, 1978.[1] The bank asked the college to advise promptly the two insurance companies owning the bonds "that [it

---

1. In his letter the president of the college indicated that the college would be able to meet these payments on February 8, 1978. Actually, it did not make the payments on that date.

was] not going to make the payments" due on January 1, 1978, which the college did, and later on January 3, 1978 the bank wrote, at the request of the college, the collection agent for the bondholders, which had submitted the interest coupons for payment, for deferment of payment of such coupons and asked for instructions from the bondholders with respect to such request. The record does not include any answer to this letter of the trustee.

Notice of the college's financial difficulties and default was not unexpected by the bondholders; at least this was true of U. S. Life, which, at the request of the college, had granted earlier an extension for the interest payment due on July 1, 1977 until September, 1977, because of the college's strained financial condition. In any event, the bondholders seemingly determined it to be the "prudent" course under the circumstances to permit the college to continue as a going concern, since this appeared the only way they could recoup any loss under the loan. They accordingly made no request of the trustee to take any action under the indenture against the college and acquiesced in the continued operations of the college.

In March 1978 the financial condition of the college had become so critical that it was being momentarily threatened with the complete cut-off of all electricity. In order to prevent immediate closing of the college by this cut-off of electricity, the bank, with full appreciation of the college's fragile financial condition, loaned it $130,000. Sometime later the college seems to have repaid $17,000 of this loan but the balance ($113,-000) was later charged off by the bank as a complete loss.

In April 1979 Dederick, the general counsel of Ministers Life, visited Durham in order to make an on-the-spot evaluation of the loan held by the plaintiffs. He visited both with the trustee and with the college authorities and canvassed with them the financial condition and future prospects of the college. Upon his return to his office he prepared for his company's board a report, coupled with recommendations, on his investigation. In this report he first gave his evaluation of the college's president: "Dr. Hill is a very aggressive, seemingly competent and dedicated individual who probably found himself with an overly ambitious capital improvement plan and thereafter found that the enrollment would not necessarily support his capital plan." Later, he added: "Dr. Hill impresses me as an honest, hard driving person who is probably going to turn the corner or possibly kill himself trying." Significantly, he proposed that no action be taken against the trustee, saying:

"As it relates to the Trustees [sic], I would not be of a mind to recommend any action against them. I think they have proceeded in good faith to try to keep this thing together under extremely adverse circumstances."

Nor did he recommend that any resort to legal remedies against the college itself be undertaken either directly or through the trustee, saying "that is really an academic question at this juncture." Mr. Dederick suggested that his recommendations should likely be shared with U. S. Life and presumably they were.

In early 1980 the college authorities abandoned hope and filed a petition for reorganization under Chapter 11 of the Federal Bankruptcy Act. At this point the plaintiffs for the first time requested the trustee to foreclose. The trustee promptly proceeded to foreclose and the mortgaged dormitory was sold for a gross price of $50,000, from which the bondholders netted $43,-929.10 in that foreclosure.[2] In the meantime in July 1980, the bondholders filed this suit in which they sought to recover of the trustee the entire unpaid principal balance on their bonds and accrued interest. After trial, the district judge, in a well-reasoned opinion, agreed in part with the position of the bondholders, and in part with that of the defendant trustee.

2. Prior to 1980 the bondholders had received $95,000 in payments on the principal of the bond issue and $323,518.75 in interest.

In his opinion, the district judge identified the three issues for decision in the case as: (1) What duty the bank as trustee owed the bondholders; (2) What breaches, if any, of such duty occurred; and (3) If there were breaches, what damages were recoverable. On the matter of the trustee's duty, he observed at the outset that, under the controlling law of North Carolina, the extent of the bank's duty as trustee was determinable by the terms of the indenture itself.[3] In construing its terms, he concluded that the indenture imposed "very few mandatory obligations" on the trustee but granted it "a broad range of rights and powers to be exercised in its discretion," with judicial review of such exercise "limited to scrutiny for dishonesty, bad faith, failure to exercise judgment, or unreasonable exercise of judgment." He found as a fact that there had been "no showing of dishonesty or bad faith" on the part of the trustee, and, in view of the exculpatory provision in the indenture, he held that "the court's scrutiny [of the trustee's action for failure to exercise judgment or unreasonable exercise of judgment] is confined to whether the bank failed to ascertain the facts necessary for the prudent exercise of discretion." [4]

Applying this standard of duty, the district judge found that the trustee had breached its duty "to ascertain the facts necessary for the prudent exercise of judgment" after default by the college in the performance of its [the college's] obligations under the indenture. In connection with that finding he identified various defaults on the part of the college, such as the failure to make payments into the "Interest Fund" and the "Sinking Fund" in the manner and at the times provided by the indenture, the failure to furnish the trustee with current financial information, and the incurring of additional mortgage indebtedness. The district judge found that in its reaction to these breaches the trustee had failed to exercise reasonable discretion because of a neglect on its part to secure the necessary facts before the exercise of such discretion. In addition, he found that the trustee had failed to exercise reasonable discretion in releasing the entire "Sinking Fund" to meet current interest and principal retirement payments under the circumstances, and had violated the duty of loyalty in collecting $17,000 on a debt due it by the college after the college had discontinued any payments on the debt secured by the indenture of which the defendant was trustee.

On the issue of damages recoverable by the bondholders for breach by the bank of its duties, the district judge concluded as a matter of law that the bondholders could only recover for such loss as the bondholders may establish to have been proximately caused by the bank's violations. Applying this rule, he found as a fact that no damage was suffered by the bondholders "in any discrete and ascertainable amount caused by the bank's violation of the secondary financing prohibition, failure to require the College to file the UCC continuation statement, or alteration of the four separate funds established by the Indenture." He, however, found that "it was an error of judgment for the bank to [have] fail[ed] to require the College to maintain the $50,000 balance in the reserve fund" and that "damages in the amount of $50,000 must be assessed" against the bank for this breach. He further found that the $17,000 payment which he found the bank accepted for application on a debt due it by the college after the college had ceased paying the bondholders was recoverable by the bondholders. The district judge accordingly granted judgment against the bank in the sum of $67,000.

---

3. *Woodard v. Mordecai*, 234 N.C. 463, 67 S.E.2d 639, 644 (1951); *see also, Maynard v. Sutherland*, 313 F.2d 560, 565, n. 15 (D.C.Cir. 1962); *Gouley v. Land Title Bank & Trust Co.*, 329 Pa. 465, 198 A. 7, 8 (1938).

4. In *Woodard v. Mordecai, supra,* the Court said:

"The trustee abuses his discretion in exercising or failing to exercise a discretionary power if he acts dishonestly, or if he acts with an improper even though not a dishonest motive, or if he fails to use his judgment, or if he acts beyond the bounds of a reasonable judgment." 67 S.E.2d at 644.

Both the plaintiffs-bondholders and the defendant trustee have appealed. The bondholders complain that the district judge did not award them a judgment for the full unpaid amount of principal and interest remaining unpaid on their bonds. The trustee complains of the district court's finding of a breach by it of its obligations under the indenture and of the award of a judgment of liability against it.

Both the bondholders and the trustee profess to agree with the district court's analysis of the trustee's duties under the indenture, though they express their agreement in somewhat different language. Construing the exculpatory clause along with other provisions in the trustee section of the indenture, the defendant states in its brief the standard by which any liability of the trustee was to be measured as follows: "Thus, if the Bank acted in good faith and if there was no negligent failure to ascertain facts, it cannot be liable, by the express terms of the Indenture." The plaintiffs, on the other hand, after recognizing that the breaches charged by them against the trustee involved discretionary powers of the trustee, phrased the ultimate legal question of the trustee's liability to be "limited to determining whether the bank failed to ascertain the facts necessary for the prudent exercise of discretion." As is obvious, neither party, in its construction of the trustee's duties and responsibilities under the indenture, departs substantially from the controlling rule as set forth by the district judge. It seems, therefore, to be agreed that the test of the trustee's liability is as it was stated by the district judge.

The plaintiffs accept, of course, the findings of the district judge that the defendant had violated its duties as trustee but the defendant takes sharp issue with these findings. There is a great deal to be said for much of the defendant's position. It cannot be disputed that in all of its actions as trustee the bank was acting in perfect good faith and with a becoming regard for the protection of the bondholders, or, as Dederick the general counsel of one of the bondholders phrased it, acting "in good faith [in order] to try and keep this thing together under extremely adverse circumstances." And it did so with considerable advantage to the bondholders, who until January 1, 1978, had received interest on the college's debt in the amount of $323,518.75 and had secured retirements in the amount of $95,000 of all the bonds which were scheduled for retirement between 1970 and 1978 under the terms of the indenture. It is equally clear that it did this at substantial loss. From the period of 1970 on, the college was kept "afloat" by the financial assistance of the bank, which suffered well over $100,000 in losses in so doing. It seems fairly inferable that it was as a result of this assistance by the bank that the bondholders were able to realize what they did from this "high-risk" loan.

It is true, as the bondholders now argue, that the bank did not immediately foreclose on the college when there was a default by the college under the indenture. This was not because, as the plaintiffs argue, the defendant was not fully cognizant of the financial condition of the college but, because in its judgment foreclosure would have been an act which would have forestalled the opportunity of the bondholders to have made any substantial subsequent recoupment on their loan. This judgment that if the bank had foreclosed, the likelihood of the bondholders collecting anything after September, 1977, would have been minimal,[5] cannot be easily refuted. Had it done so, all that would have remained for the bondholders might well have been the mortgaged property and little could have

5. It is significant that, though the defendant on one or more occasions invited the bondholders to instruct it on whether foreclosure should be begun, the bondholders never directed the trustee to do so until after the college filed in bankruptcy in 1980. That this was a reasoned conclusion by the bondholders is shown by Dederick's memorandum, which was prepared after an on-the-spot investigation. It seems odd that the bondholders would indict the trustee for an abuse of discretion in this regard when, under roughly similar circumstances, the bondholders themselves determined upon and followed the very same action as had the trustee.

been expected from the foreclosure sale of a one-purpose building located as this dormitory was in an area so zoned that its saleability was diminished to a minimum.

■ The finding of the district court with reference to the Reserve Fund is not easily cast aside as insupportable. The college deposited with the trustee the Reserve Fund of $50,000, which was to be held to assure final payment of the loan. The trustee appears to have been authorized to allow temporary withdrawals from this fund but such withdrawals were to be replaced within 90 days. The college exercised repeatedly the right to use this Reserve Fund to meet accruing interest and principal curtailments. Though it assured the bank of its intention of replenishing the Fund within the time allowed by the indenture, the college seems increasingly to have failed to meet the 90-day dead line despite repeated demands by the bank. As the financial condition of the college deteriorated, such replenishments were not only delayed but diminished with the result that, in the end the Fund was entirely exhausted. Of course, as the bank suggests, the Fund was actually received by the bondholders in payment of interest and principal on their bonds. Moreover, if the Fund had not been so utilized, the college would have been unable to make certain of the payments on interest and principal which it did make. Accordingly, so goes the argument of the bank, there was no actual loss realized by the bondholders as a result of the management of the Reserve Fund. The record gives support to this reasoning. But the district judge found:

"The court does find, however, that it was an error of judgment for the bank to fail to require the College to maintain the $50,000 balance in the reserve fund. Knowing of the College's cash squeeze, the bank as trustee for the bondholders should in prudence have insisted upon the maintenance of this small cushion. The bank contends that had the $50,000

account been maintained, the ultimate default would have occurred earlier, resulting in the same loss to the bondholders. This contention cannot be accepted, however, because it is not clear to the court that the deposit of $50,000 at some earlier point would necessarily have resulted in an earlier default."

While we might have reached a different conclusion on the facts, the finding of the district judge cannot be said to be clearly erroneous and must be affirmed.

■ We are, however, unable to find substantial evidence supporting the finding of a breach of the obligation of loyalty by the bank because it accepted a payment of $17,000 on a debt of the college to it after it knew that the college was in default in its payments on the debt held by the bondholders. The debt on which the $17,000 was supposed to have been made was represented by a loan granted the college in the amount of $130,000 "in March or April, 1979," according to President Hill's testimony.[6] This loan was made to meet urgent "operating expenses" of the college. Without it, President Hill explained, "we would not have been able to pay our faculty and staff. We would not have been able to pay the light bill and the other normal kinds of operating expenses—utilities and this type thing." The loan was only for about ninety days and was to be repaid out of collections currently expected if the college remained open and was made on the assumption that "we [the college] were going to complete our refinancing," if we were able to remain open. The bondholders knew of this attempt by the college to refinance its indebtedness and to pay off the bondholders. Mr. Dederick refers to such refinancing in his report to the Investment Committee of Ministers Life. In fact, he recommended that "[i]f the refinancing comes along, I would recommend that we cooperate immediately and consider seriously forgiving any of the backed up interest."

6. Exhibit 13 gives the date of the loan as March, 1978. The difference in dates between the Exhibit and President Hill's testimony is not important, however, to the legal issue involved.

In keeping the college going with its loan while efforts at refinancing were in progress the bank was seeking to aid in the only step that could be taken to salvage the "high-risk" loan the insurance companies had made. Certainly the loan was not one that inured to any benefit to the bank and this fact was recognized from the outset by the bank itself in its rating of the loan. Actually, the bank never collected anything on the loan, according to President Hill. The district court assumed, however, the bank had received a payment of $17,000 from the college on the loan. Apparently this finding rests on a statement in Exhibit 13 that $113,000 was charged off by the bank as a loss on the college's indebtedness to it. The district court deduced from this that there had been a $17,000 payment to the bank on the $130,000 note. Even if the college did pay $17,000 on the note, we perceive no breach of the fiduciary duties of the bank and certainly no prejudice to the bondholders. Unless this loan had been made the college would have closed earlier without any possibility of refinancing. By making the loan the bank kept the college in operation and enabled it to collect fees it would never otherwise have realized. If, from these additional funds realized by the college from its continued operation, it paid to the bank little more than ten per cent. of the loan made it in order to finance such continued operations, the bondholders were deprived of nothing they would otherwise have had available to them for application on their loan. Had the college gone into receivership and secured this $130,000 loan in the form of an authorized receiver's note from the bank in order to continue in business and to prosecute its efforts at refinancing, there would be little argument that the receiver would have been entitled to repay such loan out of revenues realized from the continued operations. We perceive no real distinction between such a case and the one here. Accordingly, assuming that the statement in Exhibit 13 is sufficient, despite the contrary testimony of President Hill, to establish a payment of $17,000 on this $130,000 loan by the bank to the college, we find no legal or factual basis for imposing a liability of $17,000 on the bank on the theory that the bank violated a duty of loyalty to the bondholders.

■ Accepting the district court's finding of a breach by the bank in its duty under the indenture in the one particular noted above, the remaining question on this appeal is the recovery to which the bondholders are entitled on account of such breach. The general rule is that a defendant's liability in such a situation is limited to the loss which proximately results from his breach. And this is the rule which is recognized in North Carolina. Thus, in *Pike v. Wachovia Bank & Trust Co.*, 274 N.C. 1, 161 S.E.2d 453, 466 (1968), the Supreme Court of North Carolina said:

> "In order to recover compensatory damages in a contract action, plaintiff must show that the damages were the natural and probable result of the acts complained of and must show loss with a reasonable certainty, and damages may not be based upon mere speculation or conjecture."

To the same effect is *Olan Mills, Inc. v. Cannon Aircraft Executive Terminal, Inc.*, 273 N.C. 519, 160 S.E.2d 735, 744 (1968), in which the court, in upholding the jury charge on damages, said:

> "The charge, when read as a composite whole, leaves us with the impression that the jury must have understood that the defendant was liable only for damages which proximately resulted from its negligence."

That rule has been applied specifically in connection with charges asserted as here against a trustee for alleged losses resulting from a breach of his fiduciary duties. Bogert in the text *Trusts and Trustees*, § 710 at p. 467 (2d Rev.Ed.1982) states:

> "The courts are limited by the rule that the complainant must show with certainty that he suffered the amount of damage he claims. It is not sufficient that there is a mere probability or possibility. If he merely shows that he suffered some loss but cannot fix its amount, his case will fail.

"The beneficiary must bear the burden of proving that the act or omission of the trustee has caused a diminution of the trust income or principal."[7]

The plaintiffs, however, have advanced the novel proposition that, whenever a breach of the obligation by a trustee has been proved, the burden shifts to the trustee to establish that any loss suffered by the beneficiaries of the trust was not proximately due to the default of the trustee, and that, unless the trustee meets this burden, recovery against the trustee for the full loss follows in course. Such a rule, if acceptable, would change entirely the burden of proof traditional in contract and tort cases alike under which the plaintiff has the burden of establishing that the loss he asserts was proximately due to the defendant's breach or tort. The plaintiffs would find authority for their position, so contrary to the general principles, in cases such as *People's National Bank v. Waggoner*, 185 N.C. 297, 117 S.E. 6, 8 (1923), and *Edgecombe Bank & Trust Co. v. Barrett*, 238 N.C. 579, 78 S.E.2d 730, 735 (1953). Neither of these cases, however, dealt with burden of proof in the typical breach of contract type of case. Each involved what the court in *Edgecombe* identified as the "rule of trust pursuit" or the situation where a trustee has converted trust property and commingled the proceeds with his own funds. In that situation, the beneficiaries of the trust are permitted to follow the trust property into the hands of the recreant trustee and reclaim the trust property if it is reasonably identifiable in the hands of the trustee; but, if, as a result of the wrongful commingling, the beneficiaries are prevented from separating their assets from "the entire mass" in which their assets as converted have been commingled, "equity will impress the trust character upon the entire mass and treat it as trust property or funds in so far as the trustee may be able to distinguish what is his." *Id.* 78 S.E.2d at 736. There has been, however, no conversion in this case and there has been no commingling of trust property with the trust estate; we are not, therefore, concerned with any "rule of trust pursuit" and cases addressed to such rule are irrelevant to the issue here.

We do not suggest that where a plaintiff has established damage as a proximate result of a defendant's negligence or contract breach but is unable to prove precisely the amount of such damages, there can be no recovery of damages because he cannot prove precisely the amount of such damages. Such a standard, particularly if applied in antitrust and patent infringement cases, would be contrary to the principle enunciated in *Story Parchment Co. v. Patterson Co.*, 282 U.S. 555, 564–66, 51 S.Ct. 248, 251, 75 L.Ed. 544 (1931), and followed by us recently in an antitrust case in *United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 993 (4th Cir. 1981). As the Court said in *Story Parchment*, "[t]he rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount." *Id.* at 562, 51 S.Ct. at 250. Under this principle, a plaintiff must prove both a breach and causation of injury but, once there is such proof both of breach and of loss proximately caused by that breach, "lesser certainty is required," certainly in antitrust and patent infringement cases, in the later proof of the extent of damages, *Jot-Em-Down Store (JEDS) Inc. v. Cotter & Co.*, 651 F.2d 245, 248 (5th Cir. 1981), or, as it is put in another case, "[t]he antitrust plaintiff's burden of proving the amount of damages is lighter than the burden of proving injury in fact," *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 858 (5th Cir. 1981). This "lesser certainty" requirement is met, according to *Story Parchment*, "if the evidence show [sic] the extent of the damages as a matter of just and reasonable infer-

7. To the same effect *see, Title Guarantee & Trust Co. v. Wilby*, (1946), 78 Ohio App. 183, 69 N.E.2d 429, 435; *Bessel v. Dept. of Financial Institutions*, 213 Ind. 446, 11 N.E.2d 683, 688– 89 (1937); *Fourt v. Edwards*, 21 Wyo. 393, 132 P. 1147 (1913); *Meyer v. Kenmore-Granville Hotel Co.*, 308 Ill.App. 78, 31 N.E.2d 330, 332 (1941).

ence, although the result be ·only approximate," and "the finding of the jury [or, if a non-jury case, the finding of the district judge] upon that question [will] be allowed to stand unless all reasonable men, exercising an unprejudiced judgment, would draw an opposite conclusion from the facts." *Id.* at 563 and 566, 51 S.Ct. at 250 and 251.

 Whether the rule in *Story Parchment* is applicable in this type case may be open to doubt but the question is academic since plaintiffs have not qualified for the lesser standard of proof in this case in the case of any breach other than of the two found to have proximately resulted in damage to the plaintiffs. The district court stated categorically in this case that it could not find "damages in any discrete and ascertainable amount caused by the bank's violation of the secondary financing prohibition, failure to require the College to file the UCC continuation statement, or alteration of the four separate funds established by the Indenture." It did find damages in the amount of $50,000 in the failure "to require the College to maintain the $50,000 balance in the reserve fund." That finding has support in the record and is not such that "all reasonable men, exercising an unprejudiced judgment, would draw an opposite conclusion from the facts." Such finding, therefore, is binding upon all parties.

Finally, the plaintiffs assert that the district judge erred under the law of North Carolina in not allowing interest on the judgment herein from the date of breach. We may agree that the right to interest is "governed by the law of the forum state," which in this case would be North Carolina, *Hardy-Latham v. Wellons*, 415 F.2d 674, 679 (4th Cir. 1968), and that, under North Carolina law, interest is allowable from the date of breach in those breach-of-contract actions where "the amount of damages can be ascertained from the contract." *Interstate Equipment Co. v. Smith*, 292 N.C. 592, 234 S.E.2d 599, 604 (1977); *Rose v. Vulcan Materials Company*, 282 N.C. 643, 194 S.E.2d 521, 540 (1973). This, though, is plainly not a case in which interest is recoverable for breach since "the

amount of damages [could not] be ascertained from the [indenture]." Actually, the action partakes more of a tort action than an action strictly in contract. The district judge was accordingly not in error in denying interest on the judgment.

The judgment of the district court is affirmed in part and reversed in part.

AFFIRMED IN PART and REVERSED IN PART.