IN THE SUPREME COURT OF NORTH CAROLINA

No. 63A24-1

Filed 22 August 2025

GLENN MOSELEY

v.

JOHNNY A. HENDRICKS, JR. and CITY OF WILSON

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 292 N.C. App. 258 (2024), affirming judgments entered on 3 June 2021 and 7 December 2022 by Judge William D. Wolfe in Superior Court, Wilson County. Heard in the Supreme Court on 17 September 2024.

*Narron & Holdford, P.A., by Ben L. Eagles; and Kurt Schmidt for plaintiff-appellant.*

*Brown, Crump & Tierney, PLLC, by Noelle K. Demeny and O. Craig Tierney Jr., for defendant-appellee Hendricks.*

*Cauley Pridgen, P.A., by Clayton H. Davis, James P. Cauley III, and Emily C. Cauley-Schulken, for defendant-appellee City of Wilson.*

ALLEN, Justice.

"The law expects individuals to take reasonable steps to protect themselves from open and obvious risks. For this reason, plaintiffs ordinarily cannot recover damages from defendants who created such risks if the plaintiffs could have avoided harm through due regard for their own safety." *Cullen v. Logan Devs., Inc.*, 386 N.C. 373, 374 (2024). In this case, plaintiff Glenn Moseley filed suit over eye injuries he sustained when a golf ball hit by defendant Johnny A. Hendricks Jr. struck him at a

driving range operated by defendant City of Wilson. Because plaintiff failed to take reasonable care for his own safety under the circumstances, the Court of Appeals correctly held that contributory negligence bars his negligence claims against defendants. We therefore affirm.

## I. Background

The following summary of events comes from the evidence presented to the trial court. On the morning of 23 December 2018, plaintiff, defendant Hendricks, and three other men met for a golf game at Wedgewood Municipal Golf Course in Wilson, North Carolina. Plaintiff had played golf for the first time fifteen to twenty years earlier, though it had been about ten years since his last game.

The group drank alcohol while on the golf course, sharing a quart jar of whiskey brought by defendant Hendricks. By all accounts—including his own—plaintiff imbibed more whiskey than any other member of the group. The group also consumed beer purchased at the golf course's clubhouse. One group member estimated that plaintiff drank five to ten beers. Plaintiff had not eaten anything that morning.

Alcohol consumption left plaintiff heavily impaired. He became so intoxicated that he lost his balance and fell to the ground while trying to push a golf tee into the turf at the sixteenth hole. Recognizing that he was inebriated, plaintiff did not drink any more alcohol during the rest of the game.

Afterwards one group member went home, but plaintiff, defendant Hendricks,

and two others—Michael Taylor and Taylor Keith—proceeded to the driving range. When viewed from the shelter at its entrance, the driving range was bordered on the right side by a fence sixty or seventy yards in length. Consisting of a low screen barrier approximately six feet high topped by netting, the fence separated the driving range from an asphalt parking lot, although about a third of the parking lot extended beyond the end of the fence. A narrow strip of grass lay between the fence and the parking lot.

The group traveled to the driving range in two golf carts, with defendant Hendricks driving Michael Taylor in one cart and Taylor Keith driving plaintiff in the other. Defendant Hendricks parked his cart in the parking lot just behind the far end of the fence. The cart faced the fence, such that it would have run into the fence had defendant Hendricks continued driving forward. Keith parked plaintiff's cart in the parking lot to the right of defendant Hendricks's cart and past the end of the fence, such that plaintiff's cart would have run onto the range if he had not stopped.

Group members differed over whether Keith parked plaintiff's cart entirely on the parking lot's asphalt surface. Defendant Hendricks and Taylor testified later that all four of the cart's tires were on the asphalt. Keith remembered that most of the cart was parked on the asphalt, but he thought that the front two tires might have been on the grass in front of the asphalt and thus closer to the fence line.[1] Joshua

---

[1] In this opinion, the term "fence line" refers to the imaginary line that began at the end of the fence and ran between the driving range and the portion of the parking lot that extended past the fence.

Morrison—another golfer at the driving range that day—observed Keith park the cart and estimated that "about 75 percent of [plaintiff's] golf cart was on the driving range."

Plaintiff paid little attention to his surroundings. He did not notice where Keith had parked in relation to defendant Hendrick's cart. According to Taylor, plaintiff was "either on his phone" or "twiddling with something" as the three men departed for the tee-off area. Taylor's recollection matched that of plaintiff, who remembered sitting in the cart for several minutes texting his wife. Intoxicated and focused on his phone, plaintiff did not even realize that his companions had left. He also did not recall whether he looked up from texting at any point and observed the other group members on the driving range.

Defendant Hendricks, Taylor, and Keith did not walk through the parking lot and behind the fence to reach the tee-off area. They instead walked around the end of the fence and made their way along the driving range side of the fence.

The tee-off area had been moved forward thirty or forty yards. Consequently, it was only about thirty yards from the end of the fence.

Upon reaching the tee-off area, defendant Hendricks prepared to hit off the practice tee. He testified later that he first looked downrange to make sure no one was in his "target line." Seeing no one in front of him on the range, defendant Hendricks looked down at the ball, adjusted his position, raised his club, and hit the ball, keeping his "head down like [he had] always been taught since high school golf."

Defendant Hendricks had intended to hit the ball straight forward, but it veered to the right toward the end of the fence.

Although he did not watch the ball in the air, defendant Hendricks heard it hit something. Looking up, he saw plaintiff's cart on the range and plaintiff sitting in the cart on the passenger side. Defendant Hendricks's golf ball had struck plaintiff in the eye.

When defendant Hendricks took his shot, Keith was standing behind him, and Taylor was walking toward him. Neither Keith nor Taylor looked downrange before defendant Hendricks hit the ball. According to his deposition testimony, however, Keith watched the ball fly through the air and strike plaintiff. Taylor did not see the ball hit plaintiff, but he turned and observed plaintiff immediately after he was struck. Defendant Hendricks, Keith, and Taylor rushed over to assist plaintiff.

Joshua Morrison was in the tee-off area when defendant Hendricks hit the ball. He estimated that plaintiff's cart had been sitting stationary for approximately one-and-a-half minutes when the ball struck plaintiff.

Plaintiff did not see the ball before it hit him. He recalled hearing the impact, which sounded to him like an "open palm clap." The next thing he remembered was looking down and seeing blood on bits of gravel scattered beside the asphalt.

Recollections differed regarding the cart's location at the time of the accident. In their respective depositions, defendant Hendricks and Taylor claimed that the entire cart was past the fence line and on the range. Keith believed that part of the

cart was beyond the fence line and on the range, but he admitted that he "was not paying attention to where the golf cart was when [plaintiff] was hit." As previously noted, Joshua Morrison remembered that seventy-five percent of the cart was past the fence line and on the range.

Another golfer, Derrick Scott, who arrived on site shortly after the accident to render first aid, thought that the golf cart was parked entirely on the grass but was nonetheless behind the fence line. Scott admitted, though, that he did not actually check to determine whether the cart was completely off the range. Despite his general obliviousness to his surroundings, plaintiff took the fact that he saw blood on gravel rather than on asphalt to mean that the cart was parked at least partially in the grassy area beside the parking lot.

There was also disagreement about whether plaintiff's cart moved after Keith parked it. No one remembered seeing the cart move, but defendant Hendricks insisted that plaintiff drove the cart onto the range.

> I didn't see [plaintiff] drive on the driving range, but that's the only way it could have happened. When I looked up there was no golf cart there to make sure that there wasn't anything in front of me. There was no golf cart there. And then when I commit to the shot, addressed the ball, keep my head down . . . , take the shot, and as I'm following through I hear the sound and see [plaintiff] there where he was not there before.

Like defendant Hendricks, Taylor believed that the cart moved from its parking spot onto the range before defendant Hendricks hit the ball. While his memory was unclear on most other points, plaintiff testified that the cart did not move after Keith

parked it.

Plaintiff filed suit against defendant Hendricks on 17 June 2019 in the Superior Court, Wilson County. Plaintiff filed an amended complaint on 6 January 2020, adding the City of Wilson as a defendant. Among other things, the amended complaint alleged that (1) defendant Hendricks had negligently "[f]ailed to make sure he had a clear path in which to hit" and (2) defendant City of Wilson had negligently "[f]ailed to have proper netting and/or fencing on its driving range." The amended complaint further alleged that, as a result of his injuries, plaintiff had suffered "extreme physical pain and mental anguish" and had undergone two surgeries with more surgeries expected.

Defendants answered the amended complaint, asserting the defense of contributory negligence, which can bar a plaintiff from pursuing negligence claims when the plaintiff's own negligence combined with the defendant's alleged negligence to cause the plaintiff's injuries. Defendant City of Wilson also asserted the defense of governmental immunity, which can bar negligence claims against local governments if those claims arise from the performance of governmental functions. Both defendants subsequently filed motions for summary judgment.

On 3 June 2021, the trial court entered an order granting defendant Hendricks's summary judgment motion on several grounds, one of which was that "[d]efendant Hendricks [was] entitled to [j]udgment as a matter of law [based] on [p]laintiff's contributory negligence." On 7 December 2022, the trial court entered an

order granting defendant City of Wilson's summary judgment motion.

Plaintiff appealed both summary judgment orders to the Court of Appeals. On 6 February 2024, a divided panel of the Court of Appeals issued an opinion affirming the trial court's orders. *Moseley v. Hendricks*, 292 N.C. App. 258, 263 (2024). The majority concluded that a "proximate connection" existed between plaintiff's injury and his "fail[ure] to exercise ordinary care for his safety." *Id.* at 264. In the majority's view, plaintiff could have avoided injury by reasonably maintaining awareness of his surroundings. *Id.* Instead he displayed a "lack of situational awareness[,] due at least in part to his intoxication and the distraction from his cell phone." *Id.*

The majority further reasoned that it did not matter for summary judgment purposes how plaintiff's golf cart came to be exposed to defendant Hendricks's shot:

> For instance, if the cart was initially parked in the exposed area past the fence line by Keith, a prudent person in plaintiff's position would have noticed such a precarious position and moved out of harm's way—especially given that plaintiff estimated he had been sitting there for a few minutes. Similarly, if the golf cart had rolled forward on its own or if plaintiff himself had inadvertently driven the cart into the exposed area, then plaintiff also failed to exercise reasonable care because a prudent person in such position would have recognized the moving cart and either stopped it before it was exposed or moved out of the way after the fact. Accordingly, the trial court did not err in granting defendants' motions for summary judgment as to contributory negligence.

*Id.* at 264–65.

The majority likewise rejected plaintiff's argument that the last clear chance doctrine applies to the facts of this case. Under that doctrine, a plaintiff's contributory

negligence is not a bar to recovery if the defendant had "time and opportunity to avoid the injury notwithstanding" the plaintiff's contributory negligence. *McMillan v. Horne*, 259 N.C. 159, 160 (1963). According to the majority, defendant Hendricks "did not discover, nor should he have discovered, plaintiff's position until after he had already hit the ball." *Moseley*, 292 N.C. App. at 265. The majority emphasized "that it is standard practice for golfers not to look up again after they have started to address the ball." *Id.*

Finally, the majority declined to decide whether governmental immunity foreclosed plaintiff's negligence claim against defendant City of Wilson. *Id.* at 266. Because it held that contributory negligence defeated plaintiff's negligence claims against both defendants, the majority found it unnecessary to reach the immunity issue. *Id.*

The dissenting judge would have reversed both summary judgment orders. *Id.* at 273 (Thompson, J., dissenting). In her view, summary judgment was improper because genuine issues of material fact remained regarding contributory negligence, "particularly concerning how the golf cart in which plaintiff was seated at the time he was struck by the golf ball came to be on the driving range." *Id.* at 267. According to the dissenting judge, "wherever the golf cart was initially parked by Keith, if the cart came to be located on the driving range when plaintiff was struck, there is no evidence regarding . . . whether it was moved by plaintiff, rolled or lurched forward without action by plaintiff, or was moved by some party other than plaintiff." *Id.* at

270 (emphasis omitted). Given defendant Hendricks's testimony that he did not see plaintiff when he looked downrange before hitting the ball, the dissenting judge thought a fact-finder might conclude "that the cart could have moved into a dangerous location too quickly for plaintiff to react." *Id.* The dissenting judge also opined that governmental immunity was "not available as a complete defense" to plaintiff's negligence claim against defendant City of Wilson. *Id.* at 270–71.

On 11 March 2024, plaintiff appealed to this Court based on the dissent in the Court of Appeals. The dissent triggered an appeal of right to this Court because this case was pending at the Court of Appeals before the repeal of N.C.G.S. § 7A-30(2). *See* Current Operations Appropriations Act of 2023, S.L. 2023-134, § 16.21(d)–(e), 2023 N.C. Sess. Laws 760, 1171.

## II. Standard of Review

"We review de novo an appeal of a summary judgment order. When reviewing a matter de novo, this Court considers the matter anew and freely substitutes its own judgment for that of the lower courts." *N.C. Farm Bureau Mut. Ins. Co. v. Herring*, 385 N.C. 419, 422 (2023) (cleaned up).

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2023). "A genuine issue is one that can be maintained by substantial evidence." *Value Health Sols., Inc. v.*

*Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 267 (2023) (cleaned up). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (cleaned up).

When making a summary judgment determination, a court must view the record "in the light most favorable to the party opposing the motion." *Marcus Brothers Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 220 (1999). "[A]ll inferences of fact . . . must be drawn against the movant and in favor of the party opposing the motion." *Caldwell v. Deese*, 288 N.C. 375, 378 (1975).

### III. Analysis

The critical question presented by this appeal is whether the Court of Appeals majority correctly held that contributory negligence bars plaintiff's negligence claims against defendants. Negligence itself "is the failure to exercise proper care in the performance of a legal duty which the defendant owed the plaintiff under the circumstances surrounding them." *Moore v. Moore*, 268 N.C. 110, 112 (1966). "Contributory negligence is a defense to negligence claims [and] arises from the duty that the law imposes on us all to take reasonable care to protect ourselves." *Cullen*, 386 N.C. at 377.

Except in rare cases, it is for a jury to decide whether a plaintiff's conduct amounted to contributory negligence. On the other hand, a court may conclude that a plaintiff was contributorily negligent as a matter of law if "the plaintiff's evidence

fails to raise any issue of material fact and the evidence of contributory negligence is uncontradicted." Mark W. Morris, *North Carolina Law of Torts* § 19.20[1][c][iv] (2024).

In the contributory negligence context, "our case law has made it clear that when the condition that allegedly caused the injury, viewed objectively, is open and obvious, judgment as a matter of law is appropriate." *Draughon v. Evening Star Holiness Church of Dunn*, 374 N.C. 479, 482–83 (2020). "A condition is open and obvious if it would be detected by 'any ordinarily intelligent person using his eyes in an ordinary manner.'" *Cullen*, 386 N.C. at 378 (quoting *Draughon*, 374 N.C. at 483).

Here, the evidence before the trial court unequivocally demonstrates that the threat of injury to plaintiff was open and obvious. Although witnesses disagreed over exactly where the cart was located at the time of plaintiff's accident, the inconsistencies in their testimony did not create a genuine issue of material fact precluding summary judgment. Players in the tee-off area (defendant Hendricks, Taylor, Keith, and Morrison) could see plaintiff after defendant Hendricks hit the ball. Indeed, Keith testified that he watched the ball hit plaintiff. Thus, regardless of the cart's precise location, uncontradicted evidence establishes line of sight between plaintiff and the tee-off area when the accident occurred. If he had looked up from his phone, plaintiff would have seen that he was sitting a mere thirty yards or so downrange from the tee-off area.

As the Court of Appeals majority explained, plaintiff's nearly total lack of

situational awareness amounted to contributory negligence under the circumstances.

> [P]laintiff failed to exercise ordinary care for his safety, and there was a proximate connection between that failure and his injury. Although not an avid golfer, plaintiff testified that—having previously played and watched the sport—he was familiar with its rules and the dangers of being exposed to areas where balls are hit. Thus, when plaintiff became exposed to the flight of defendant Hendricks's ball in the driving range, his lack of situational awareness— due at least in part to his intoxication and the distraction from his cell phone—constituted plaintiff's failure to exercise ordinary care. Although plaintiff testified that he was unaware he was even at the driving range—let alone in an exposed area—he would have known had he acted reasonably by maintaining awareness of his surroundings.

*Moseley*, 292 N.C. App. at 264 (cleaned up).

In reaching its holding, the Court of Appeals majority cited this Court's decision in *Pierce v. Murnick*, 265 N.C. 707 (1965) (per curiam). *Moseley*, 292 N.C. at 264. There, the plaintiff was injured at a professional wrestling match when a wrestler who had been thrown from the ring fell against him. *Pierce*, 265 N.C. at 708. At the time of the incident, the plaintiff occupied a ringside seat. *Id.* In ruling that contributory negligence defeated the plaintiff's negligence claim against the promoter, this Court noted that the plaintiff had previously attended numerous wrestling matches, where he had seen other wrestlers pushed or thrown out of the ring. *Id.* at 709.

Like the plaintiff in *Pierce*, plaintiff knew enough to comprehend the hazards posed by his situation. Unlike his counterpart in *Pierce*, plaintiff may have been too intoxicated to appreciate his peril. This distinction does not inoculate plaintiff against

the consequences of his own negligence, however. "[T]he existence of contributory negligence does not depend on [a] plaintiff's subjective appreciation of danger; rather, contributory negligence consists of conduct which fails to conform to an objective standard of behavior," that is, the "care an ordinarily prudent person would exercise under the same or similar circumstances to avoid injury." *Smith v. Fiber Controls Corp.*, 300 N.C. 669, 673 (1980) (emphases omitted). An ordinarily prudent person in plaintiff's shoes would have perceived the threat to himself and moved to a safer location.

In his brief to this Court, plaintiff argues that Derrick Scott's testimony places the cart behind the fence line at a point where the bottom portion of the fence would have obstructed plaintiff's view of the tee-off area. Based on our review of the record, we disagree. Scott testified that, when he arrived on the scene to provide first aid, plaintiff's cart was positioned past the end of the fence and entirely on the grass beside the parking lot. Even if we assume that the cart was not in the range, the narrowness of the grassy area between the fence line and the parking lot necessarily means that any cart located entirely therein had to be close to the fence line. In that position—past the end of the fence but up against the fence line—the cart would have been visible from the tee-off area and vice versa.

Similarly, during oral argument, plaintiff contended that a jury could infer from his testimony about seeing blood on gravel in the area beside the parking lot that the cart was not parked far enough forward to offer a view of the tee-off area

unobstructed by the fence. Although plaintiff's testimony can support an inference that the cart was either partially or wholly on the grass, there is no room in the evidence for the additional inference that plaintiff wishes to draw. The evidence, including the testimony of everyone who—unlike plaintiff—observed the cart's location, establishes line of sight between the cart and the tee-off area. The players in the tee-off area would not have rushed to provide aid to plaintiff, for example, if they had not been able to see that he had been struck.

Plaintiff further argues in his brief to this Court that *McWilliams v. Parham*, 269 N.C. 162 (1967), controls the outcome of this appeal. In *McWilliams*, a caddy alleged that he was struck in the eye by a golf ball hit by a player who had failed to provide any warning. *Id.* at 163–64. This Court acknowledged the "well . . . established custom among golfers to give warning by crying 'Fore,' or some similar exclamation, prior to attempting to drive a golf ball into the vicinity of another person on the course who does not appear to be aware that such a drive is about to be made." *Id.* at 167.

The *McWilliam*s decision is inapposite for two reasons. First, it involves the behavior of golfers on golf courses, where players commonly hit golf balls in the direction of people ahead of them. Plaintiff was injured at a driving range, where driving golf balls in the direction of others is not so common. Second, in *McWilliams* this Court analyzed the validity of a defendant's assumption-of-risk defense, not a defense of contributory negligence. *See* 269 N.C. at 164 (noting that contributory

negligence was "not involved in the questions . . . presented for review").

Furthermore, we cannot endorse the dissenting judge's argument that summary judgment was inappropriate because the evidence would allow a jury to find that "the cart could have moved into a dangerous location too quickly for plaintiff to react by looking up." *Moseley*, 292 N.C. App. at 270 (Thompson, J., dissenting). It is true that, at summary judgment, "all inferences of fact . . . must be drawn against the movant and in favor of the party opposing the motion." *Caldwell v. Deese*, 288 N.C. 375, 378 (1975). Yet the dissenting judge did more than draw an inference in plaintiff's favor; she substituted her own theory of the case for plaintiff's.[2]

In his brief to the Court of Appeals, plaintiff argued that the evidence showed the following when viewed in the light most favorable to him:

> [D]efendant Hendricks had one and a half minutes to recognize that [plaintiff] was in danger and alert him to move, or not hit the ball at all. Defendant Hendricks was aware of the plaintiff's location when he walked onto the driving range. *The cart [plaintiff] was in had been parked in that spot the whole time.*

(Emphasis added.) Thus, plaintiff's theory of the case expressly incorporated plaintiff's contention that the cart remained stationary. By displacing this theory

---

[2] Our dissenting colleagues do much the same thing, offering inconsistent—and even far-fetched—theories regarding the cart's alleged movement. In addition to arguing that the cart could have moved too rapidly for plaintiff to react, they also ask readers to "imagine" that "a gust of wind" caused the cart to begin "creeping down the slight 'down slope' in the terrain" after Taylor walked away. Of course, if the cart merely crept down the slope, then plaintiff had time to react and mitigate the risk to himself. What is more, the photographs included in the dissent show that the area between the parking lot and the driving range was virtually level, rendering the "gust of wind" theory manifestly implausible.

with an alternative one, the dissenting judge impermissibly "supplement[ed] an appellant's brief with legal authority or arguments not contained therein." *Goodson v. P.H. Glatfelter Co.*, 171 N.C. App. 596, 606 (2005).

Plaintiff did not argue the last clear chance doctrine in his brief to this Court. Accordingly, we do not consider whether on the facts of this case it would overcome defendants' contributory negligence defense. *See* N.C. App. R. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.").

Lastly, like the Court of Appeals majority, we do not decide whether governmental immunity bars plaintiff's negligence claim against defendant City of Wilson. Our holding that contributory negligence prevents plaintiff from pursuing that claim eliminates any need to address the immunity issue.

### IV. Conclusion

Plaintiff was contributorily negligent as a matter of law. We therefore affirm the decision of the Court of Appeals affirming summary judgment for defendants.

AFFIRMED.

Justice EARLS dissenting.

One thing clear about this case is that it is not clear where Mr. Moseley's golf cart was when he was struck. The record is a tangle of open questions and conflicting accounts about where the cart was first parked, where it ended up, and how it got there. Each point is genuinely disputed, particularly when we "credit all facts asserted by" Mr. Moseley and "draw any inferences in [his] favor." *Est. of Graham v. Lambert*, 385 N.C. 644, 650 (2024) (cleaned up). And each point is material—all bear on whether Mr. Moseley failed to take "reasonable steps" to avoid an "open and obvious risk[ ]." *Cullen v. Logan Devs., Inc.*, 386 N.C. 373, 374 (2024) (cleaned up). Properly viewed, the record does not show Mr. Moseley's "own negligence so clearly that no other reasonable conclusion may be reached." *Nicholson v. Am. Safety Util. Corp.*, 346 N.C. 767, 774 (1997) (cleaned up). Because key factual disputes remain, this is not one of the "exceptional negligence cases" fit for summary judgment. *Ragland v. Moore*, 299 N.C. 360, 363 (1980). I therefore would reverse the Court of Appeals and remand for trial. Respectfully, I dissent.

First, I start with principles. Negligence cases are "within the special competence of the jury." *City of Thomasville v. Lease-Afex, Inc.*, 300 N.C. 651, 655 (1980). That is a matter of both doctrine and institutional design. The negligence standard itself—what a reasonable person would do under a given set of circumstances—calls for common-sense judgments grounded in everyday experience. *See Page v. Sloan*, 281 N.C. 697, 706 (1972). So too with proximate cause. Whether

an outcome was reasonably foreseeable is "ordinarily" a jury question because it weighs the "attendant circumstances" using everyday understandings of cause and effect. *Olan Mills, Inc. of Tenn. v. Cannon Aircraft Exec. Terminal, Inc.*, 273 N.C. 519, 529 (1968) (citing *Pruett v. Inman*, 252 N.C. 520, 526 (1960)). That is why, as we have said time and again, summary judgment is "rarely" proper in negligence cases. *Moore v. Crumpton*, 306 N.C. 618, 624 (1982). And that is why judges must "tread gingerly" when asked to such matters away from the jury. *Est. of Graham*, 385 N.C. at 650. That step "is strong medicine" and "should be used with caution." *Id.* (cleaned up); *see also Williams v. Carolina Power & Light Co.*, 296 N.C. 400, 402 (1979) (describing summary judgment as a "drastic measure," especially "in a negligence case in which a jury ordinarily applies the reasonable person standard to the facts of each case").

Our summary judgment standard reflects that caution. It places the burden on the moving party—here, Mr. Hendricks—to "clearly establish[ ] the lack of any triable issue of fact by the record properly before the court." *Moore v. Fieldcrest Mills, Inc.*, 296 N.C. 467, 469–70 (1979). With that burden come rules for how to view the record. Mr. Hendricks's "papers are carefully scrutinized" and held "to a strict standard." *Page*, 281 N.C. at 704, 706 (cleaned up). Mr. Moseley, by contrast, is given the benefit of the doubt. *See Dobson v. Harris*, 352 N.C. 77, 83 (2000). His claims are "indulgently regarded," and every reasonable inference is drawn in his favor. *Caldwell v. Deese*, 288 N.C. 375, 378 (1975) (cleaned up); *see also Dobson*, 352 N.C. at 83 ("All facts asserted by the adverse party are taken as true, and their inferences must be viewed

in the light most favorable to that party." (cleaned up)).

At this stage, our role is not to resolve factual disputes, but only to decide if one exists. *Moore*, 296 N.C. at 470. If the record reveals contradictions—even within the plaintiff's own evidence—they go to the jury, not the judge. *Rappaport v. Days Inn of Am., Inc.*, 296 N.C. 382, 384 (1979). So do questions of credibility and evidentiary weight. *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 220 (1999). And when the facts support more than one inference about causation, it is the jury's job to decide. *Bigelow v. Johnson*, 303 N.C. 126, 132 (1981). Even if the "essential facts" are undisputed, if "reasonable people could differ" about whether a party acted with due care, it "ordinarily remains the province of the jury to apply the reasonable person standard." *Moore*, 306 N.C. at 624; *see also Page*, 281 N.C. at 708 (holding that grant of summary judgment on negligence claim was improper because "reasonable men could reach different conclusions on the evidentiary material offered").

In contributory negligence cases, then, summary judgment is foreclosed unless the evidence "so clearly establishes [the plaintiff's] own negligence as one of the proximate causes of his injury that no other reasonable inference or conclusion can be drawn therefrom." *Anderson v. Carter*, 272 N.C. 426, 429 (1968); *see also Collingwood v. Gen. Elec. Real Est. Equities, Inc.*, 324 N.C. 63, 71 (1989) (holding that summary judgment was improper because "[a]lthough some of the evidence tends to support defendant's claim of contributory negligence, this is by no means the only

reasonable inference that may be drawn from the facts of the case"). That approach, we have said, is reserved for "exceptional negligence cases." *Ragland*, 299 N.C. at 363. This is not one of them.

The majority holds that Mr. Moseley was contributorily negligent as a matter of law. It acknowledges that "witnesses disagreed over exactly where the cart was located at the time of [Mr. Moseley's] accident." But it deems those discrepancies immaterial because players in the tee-off zone "could see [Mr. Moseley] after [Mr.] Hendricks hit the ball." Because "uncontradicted evidence establishes line of sight between [Mr. Moseley] and the tee-off area when the accident occurred," the majority reasons, the cart's exact location does not matter. Wherever it was, Mr. Moseley could have "looked up from his phone" to see that he was parked "a mere thirty yards or so downrange from the tee-off area." The Court therefore concludes that the evidence "unequivocally demonstrates that the threat of injury to [Mr. Moseley] was open and obvious."

Respectfully, I see the record differently. When viewed in Mr. Moseley's favor, the evidence is far from clear-cut on whether the risk was open and obvious. Yes, he was visible at the moment he was struck. But that single frame tells us little about how—or when—he got there. Was he always in plain view, as the majority concludes? Or did he begin in a safer spot, only to end up in harm's way with little time to react? The record gives reason to think it was the latter. The cart's starting point is disputed. Its ending point is, too. And so is the path (if any) it took in between. How those

questions are answered shapes whether the danger was open and obvious—and, in turn, whether Mr. Moseley acted with reasonable care in response. If the cart began behind the fence, on asphalt, and outside the line of fire, then Mr. Moseley may have placed himself in a position of safety—at least initially. And if the cart suddenly moved into danger just before the ball was struck, a jury might find that no amount of looking up from his phone would have made a difference.

To start, witnesses gave sharply conflicting accounts about where Mr. Moseley's cart was parked. Mr. Keith, who was driving, said it was next to Mr. Hendricks's, so close that he "could barely squeeze by our two carts to get [his] club." He recalled that the two front wheels might've been on the grass," but at least "90 percent" of the vehicle was over asphalt. In front of the cart, Mr. Keith later explained, there was "a little bit of downhill" or "down slope" in the terrain. Mr. Hendricks and Mr. Taylor—who parked beside the cart—both said all four tires were on the lot. But another golfer, Mr. Morrison, recalled something else entirely: when the cart came to a stop, he thought three-quarters of it jutted past the netting into the driving range. That discrepancy bears on whether the cart was in a zone of obvious danger. If the cart was parked fully—or even mostly—on the asphalt, then there may not have been a clear line of sight between Mr. Moseley and the tee-off area.

Consider, for instance, the photos in the record.[1] One shows the cart's approximate position with all four tires on the asphalt, matching the accounts of Mr. Hendricks and Mr. Taylor. Even if 10% of the cart extended into the grass, as Mr. Keith believed, the cart still sat well behind the fence line and possibly out of obvious danger.



Consider another photo, this one taken from the tee-off area, with the wheel in the grass marking where Mr. Hendricks hit his shot.

---

[1] Each of the pictures inserted below was introduced during depositions and used by the witnesses to illustrate their testimony.



In this picture, the cart is parked with all four tires on the asphalt. That is important because, from Mr. Hendricks's vantage, the cart is invisible, obstructed by the fence. This shows that, at least for a time, Mr. Moseley was behind the fence and not in eyeshot—and could not avoid the danger just by looking up from his phone.

Witnesses likewise explained that the cart began in a safe place. Consider, for instance, Mr. Taylor's account. He recalled that he, Mr. Keith, and Mr. Hendricks walked from the parked carts into the driving range, following the fence line to the tee box. At the time, no one was hitting balls. That made it safe, in his mind, to cross the range on foot. If these players felt comfortable entering the field of play on foot, that casts doubt on whether the danger would have been obvious to someone seated in a parked cart—sheltered by a roof and windshield, on a paved surface meant for customers. A reasonable person could see that setting as one of apparent safety, not

obvious danger.

Mr. Taylor's account also suggests that the cart moved—suddenly—into the line of fire. His testimony gives key context about timing. Mr. Hendricks and Mr. Keith entered the driving range first, and Mr. Taylor followed behind after cleaning his club. That made him the last person to see Mr. Moseley and the cart before the accident. As Mr. Taylor recalled, the cart was sitting on the asphalt when he rounded the fence, walked into the driving range, and hurried toward the tee box. He was "walking pretty fast." When he was "about level with [his friends] against the fence line" and starting to turn toward them, Mr. Hendricks took his first swing. Mr. Taylor did not see the ball strike Mr. Moseley—but he heard it. From the moment he rounded the fence to walk to the tee-off zone to the moment of impact, "maybe 10 seconds at most" had passed. When he turned to look, the cart was no longer where he had last seen it; now, it was "all the way on the driving range." In his words, the cart "had been moved."

Other witnesses echoed that timeline. Mr. Hendricks looked downrange twice before swinging and saw no cart. He took the shot, then looked up—"all of a sudden there's a golf cart there with [Mr. Moseley] sitting in it where there was not one before." Mr. Keith said the same. He never noticed a cart in the range before the shot, but saw it positioned a "little bit in front of the fence" just after. That suggested to him, as he later testified, that the cart "might've moved forward some from where [he] left it." In fact, Mr. Keith believes he told others after the accident that "the cart

just rolled on its own." Mr. Moseley, too, believed the cart had moved to a more forward position at the time of impact. He denied moving it and called that idea "dangerous." Adding yet another wrinkle, another witness, Mr. Morrison, thought the cart had not moved for over a minute before the accident.

The evidence also complicates the claim that Mr. Moseley was utterly unaware of his surroundings. Mr. Taylor recalled the group stopping to buy buckets of golf balls before driving to the end of the fence line. During that time, he remembered Mr. Moseley saying he planned to stay in the cart while the others hit balls. Mr. Hendricks remembered the same. So did Mr. Keith, who was Mr. Moseley's ride to and from the course. According to Mr. Keith, he asked Mr. Moseley if he wanted to go home, but the latter had no objection to them hitting balls—everyone was "all fine" with the plan.

Mr. Moseley's level of intoxication is disputed, too. No one denies he had the most to drink, or that he was visibly impaired at one point. But by the time of the accident, his condition may have changed. Mr. Keith said Mr. Moseley stopped drinking around the 14th or 15th hole and "was starting to sober up more." Mr. Hendricks estimated it would have taken another 45 minutes to an hour to finish the round. So, by the time the group reached the driving range, Mr. Moseley may well have regained some clarity.

To be sure, some evidence cuts the other way on Mr. Moseley's situational awareness. He himself could not remember much after the last few holes. For

instance, he did not recall his friends deciding to hit balls. And after the cart was parked, his next memory was getting hit. As Mr. Moseley explained, his recollection of the accident is "fuzzy," and he has had memory issues ever since. But the more important point is that the record does not offer an open-and-shut answer about Mr. Moseley's awareness, or how obvious the danger was at the time.

The point here is not to say who is right or which witness is most credible. It is to recognize that the key facts—how the cart got into the line of fire, how fast it moved, and what Mr. Moseley knew or could have known—are unresolved. And those facts go to the heart of whether he acted as a reasonably prudent person would have.

Indeed, this Court has (perhaps unfortunately) addressed contributory negligence in another case involving an errant golf ball and a serious eye injury. *See McWilliams v. Parham* (*McWilliams II*), 273 N.C. 592, 599 (1968). That matter came to us a second time after the trial court ruled that the plaintiff—a full-grown, experienced caddy—was contributorily negligent as a matter of law. *See id.* at 596–99. He was hit in the eye when the defendant, a novice golfer, hit a ball before giving a warning—even though the plaintiff was in the line of fire. *Id.* at 598. It's true, as the majority notes, that the first appeal did not address contributory negligence. But the second did. *See id.* at 598–99. The defendant argued that plaintiff failed to use his "senses of sight and hearing" to detect that a shot was coming, and "thereby dispense with the necessity of warning by defendant." *Id.* at 598. We acknowledged that if a timely warning had been given—and the plaintiff either heard it or should

have—yet failed to act with due care, he might be contributorily negligent. *See id.* at 598–99. But we found factual disputes that precluded judgment as a matter of law. *See id.*

To start, the parties disagreed about the plaintiff's location when struck. *Id.* at 598. He testified he was just two or three feet into the rough while quickly exiting the green; defendant said he was fifteen feet in and "walking diagonally from the path of the intended flight of the ball." *Id.* at 594, 598. The timeliness of the warning was also disputed. *Id.* at 599. The defendant said he shouted "fore" *after* hitting the ball and that others nearby heard it. *Id.* Plaintiff said he heard nothing. *Id.* Still more questions swirled around the issue of contributory negligence. Defendant claimed that plaintiff "could have seen defendant on the tee had he looked." *Id.* Plaintiff conceded that he "didn't look back," but said he had no reason to—he "didn't think anybody would hit a ball that close to the green, no one ever had." *Id.* We also noted evidence that plaintiff did not know defendant was a novice and had reason to assume that others would follow standard golf etiquette by giving a warning before hitting toward someone who appeared unaware. *Id.*

This Court reaffirmed the "well recognized rule" that unless a plaintiff's evidence clearly shows contributory negligence—so clearly that "no other reasonable conclusion can be drawn"—the issue must go to the jury. *Id.* And applying that rule, we concluded the evidence would permit, but not compel, a jury to find that the plaintiff "should have been aware that defendant was about to drive the golf ball and

should have taken appropriate action to avoid injury." *Id.* Because the facts were in conflict on key points, we held that the trial court erred in taking the question away from the jury. *See id.*

The principles from *McWilliams II* carry over. The factual disputes that barred summary disposition there do the same here. In both cases, the evidence diverges on where the plaintiff was when struck, whether—and why—he failed to see the shot coming, and whether he had a fair chance to avoid the harm once it arose. And here, as in *McWilliams II*, Mr. Moseley's alleged negligence is not "so clearly" shown that the record allows "no other reasonable conclusion." *See id.*

Suppose, for example, that Mr. Keith parked the cart fully—or almost fully—on the asphalt. Suppose further that he failed to set the parking brake—something he did "most of the time," but never confirmed doing here. From that position, the cart would have been behind the fence, shielded by its roof and windshield, and outside the line of sight from the tee box. Now imagine that in the ten seconds after Mr. Taylor walked away, the cart began creeping down the slight "down slope" in the terrain. Maybe a gust of wind nudged it. Maybe someone brushing past jostled it. Maybe, when the group reshuffled clubs in the back seat, the weight shifted enough to tip it forward. As Mr. Keith himself explained, if "the front two wheels were not on the pavement"—especially with "a lot of weight in the front"—the cart could roll off on its own. Whatever the cause, suppose that the cart moved from safety into danger. And it did so fast enough that the cart was not visible to Mr. Hendricks when he

looked up the range—but fully in the line of fire by the time he struck the ball.

That sequence finds support in the record. And at summary judgment, we must view that record in Mr. Moseley's favor. From that perspective, Mr. Moseley was not a "sitting duck" who ignored an obvious risk. He began texting while seated in what a reasonable person might consider a safe spot. The cart may have shifted—whether from the slight slope, a change in weight, or some other subtle force—into the line of fire. And it may have done so quickly enough to leave Mr. Moseley no real chance to react. If the danger arose suddenly, as evidence suggests it might have, a jury could find that a reasonably prudent person in Mr. Moseley's shoes would not have had time to act and avoid harm. In that case the jury could conclude that he was not contributorily negligent—and that his claim is not barred. The questions underlying that judgment—what Mr. Moseley knew, when he knew it, and whether he had a meaningful chance to respond—are exactly the kind of factual disputes that juries are meant to resolve. I would allow one to do so here. *Cf. McWilliams II*, 273 N.C. at 599.

Nor can I fault the dissent in the Court of Appeals for following the record where it leads. The majority criticizes it for considering whether the cart moved unexpectedly—arguing that such a theory contradicts Mr. Moseley's brief. But that overlooks key context. The passage the majority cites comes not from Mr. Moseley's core argument on contributory negligence, but from his claim under the last clear chance doctrine. Under that doctrine, a plaintiff can overcome his own contributory

negligence if the defendant had "time and opportunity to avoid the injury notwithstanding" the plaintiff's fault. *McMillan v. Home*, 259 N.C. 159, 160 (1963).

But by its nature, the last clear chance doctrine applies only if the plaintiff was negligent to begin with. Mr. Moseley's principal argument was that he was *not*—or at the very least, that factual disputes precluded summary judgment on that basis. His brief made clear that the cart's location was central to assessing whether either party acted reasonably. And because "the statements of the witnesses are all inconsistent and cannot be reconciled," he maintained, the question of contributory negligence belonged to the jury. His arguments allowed for both possibilities: that he was not negligent at all, depending on where the cart was and how it got there—or, if he was, that Mr. Hendricks still had a last clear chance to avoid the harm.

At any rate, the dissent below was not required to wear blinders when analyzing the record. Witnesses like Mr. Taylor expressly testified that the cart moved from the asphalt into the driving range. And even without those direct statements, the cart's movement is the natural inference from the rest of the evidence. How else could it be out of sight one moment and squarely in view the next? The dissent did not overstep by recognizing that point. It properly identified a material factual issue—one that a jury, not a court, should decide.

At the end of the day, a jury may well find that Mr. Moseley failed to take reasonable steps to protect himself. But that is not the test at summary judgment. Our task is not to predict the verdict, but to decide whether there are material factual

disputes for a jury to resolve. *See Marcus Bros.*, 350 N.C. at 220; *Kessing v. Nat'l Mort. Corp.*, 278 N.C. 523, 534 (1971). And here, the record leaves too much open to show Mr. Moseley's "own negligence so clearly that no other reasonable conclusion may be reached." *Nicholson*, 346 N.C. at 774 (cleaned up). Because I would reverse the grant of summary judgment and remand for trial, I respectfully dissent.

Justice RIGGS joins in this dissenting opinion.